**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 31 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

KATRICE LASHAWN GLASS,

    Defendant-Appellant.

No. 96-6328

-------------------------------------------------------------------------------------------------------------

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

LARRY BURNETT, also known as
Christopher Simmons, also known as
Larry Miller,

    Defendant-Appellant.

No. 96-6342

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CR-96-58-M)**

---

Mark J. Kriger, Detroit, Michigan, for Defendant-Appellant Katrice Lashawn Glass.

Domnick J. Sorise, Clinton Township, Michigan, for Defendant-Appellant Larry Burnett.

Randal A. Sengel, Assistant U.S. Attorney (Patrick M. Ryan, United States Attorney, with

him on the briefs), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

Before **PORFILIO**, **BRORBY**, and **KELLY**, Circuit Judges.

**PORFILIO**, Circuit Judge.

A jury convicted Katrice Lashawn Glass of knowingly and intentionally possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1).  Ms. Glass appeals, among other rulings, the district court's denial of an evidentiary hearing on her motion to suppress evidence.  The same jury convicted Larry Burnett of aiding and abetting Ms. Glass in knowingly and intentionally possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  Mr. Burnett appeals his conviction, arguing in part, (1) testimony elicited at trial in violation of *Bruton v. United States*, 391 U.S. 123 (1968), was not harmless error; and (2) the district court should have suppressed substantive evidence admitted during trial as the fruit of an allegedly unlawful seizure. We have consolidated Ms. Glass' and Mr. Burnett's separate appeals only for the purpose of disposition.  Concluding the *Bruton* error was not harmless, we reverse the conviction of Mr. Burnett; however, unpersuaded by Ms. Glass' arguments, we affirm her conviction.

## I. BACKGROUND

Four Oklahoma City detectives met with drug enforcement agents early one morning at the Will Rogers World Airport in Oklahoma City, Oklahoma. There, the DEA agents informed the detectives a black man and a black woman might be smuggling drugs on a flight arriving from Los Angeles. Drug interdiction officers who had seen the pair in Los Angeles believed the man and woman were traveling companions, although they appeared to be traveling separately. The man and woman had also paid cash for one-way tickets and boarded the plane at the last minute. According to the DEA agents, the man wore tan pants, the woman a yellow-colored outfit. The four detectives went to the gate to await the flight.

Soon after the flight arrived, a black man in tan pants deplaned. Detectives Rivers and Wenthold followed him and observed he had no carry-on luggage, walked alone, and stopped several times to look around. At the baggage claim area, the suspect circled the baggage carousel for a few minutes without picking up any luggage and left the terminal, ultimately standing on the sidewalk by the passenger loading zone.

Meanwhile, the other two detectives, Detectives Leach and Aragon, followed a yellow-clad black woman, one of the last passengers off the plane, through the terminal to the baggage claim area where she picked up two bags. When she stepped outside to the passenger loading zone, she stood only several feet away from the male suspect.

Detectives Rivers and Wenthold approached the male suspect. Rivers identified himself as a drug interdiction officer and asked to speak with the man, explaining to him he was free to leave and was not under arrest. The suspect agreed to speak, and Rivers asked to see his ticket. The suspect showed him a one-way ticket from Los Angeles, paid for with cash. Rivers requested identification, and the suspect produced an identification card bearing a woman's name, which Rivers returned, saying "this couldn't be you, this is a female." The suspect then produced a California driver's license in the name of Larry Miller. Later, through a fingerprint check, the man was identified as Larry Burnett.

After returning the ticket and identification, Detective Rivers told Mr. Burnett the detectives were looking for drugs and asked to pat him down for narcotics. Mr. Burnett put his hands up in the air. Rivers pat-searched him and felt a soft object in a pocket, which Mr. Burnett acknowledged was marijuana. Detectives Rivers and Wenthold arrested him.

Meanwhile, Detectives Leach and Aragon approached the female suspect. Leach engaged the woman in conversation, following essentially the same script Rivers had used with Mr. Burnett. The woman identified herself as Katrice Glass, and the exchange culminated in Ms. Glass' agreeing to a search of her bags.

Nestled among the male underwear and male socks in Ms. Glass' bags, Detective Leach uncovered twelve bars of crack cocaine, each one placed in a plastic bag, wrapped

tightly with clear plastic tape, and tucked into a sock. The total weight was later found to be 5900 grams. Leach and Aragon arrested Ms. Glass immediately.

En route to the drug interdiction unit's offices for further questioning, Mr. Burnett called Ms. Glass a nickname and told her everything would be all right. Once there, the detectives searched Mr. Burnett more thoroughly and discovered a baggage claim check. The detectives reclaimed the bag, which contained shirts and pants, but no underwear or socks. Mr. Burnett professed not to know Ms. Glass and said he was traveling to Oklahoma City to visit his grandmother, Ruthy Maye Simmons.

During her separate interrogation, Ms. Glass also professed not to know Mr. Burnett, claiming she had seen him for the first time on the plane. After further questioning, Ms. Glass relented and told the detectives Mr. Burnett was her half-brother and Ruthy Maye Simmons was *her* grandmother, who had died five years before.

Subsequently, in pretrial motions, Mr. Burnett and Ms. Glass sought to suppress the fruits of their respective searches. The district court denied Ms. Glass' motion summarily from the bench without an evidentiary hearing. In a written order following an evidentiary hearing, the district court also denied Mr. Burnett's motion.

Ms. Glass and Mr. Burnett were tried together. The prosecution's case consisted primarily of testimony by Detectives Leach and Rivers, each testifying to their respective arrests and interrogations of Ms. Glass and Mr. Burnett. Because the government had found no cocaine in Mr. Burnett's possession, the government's aiding and abetting case

against Mr. Burnett hinged on establishing the relationship between Mr. Burnett and Ms. Glass. One-half hour into the trial, Detective Leach testified Ms. Glass had told him "she had knowingly transported the narcotics along with [Mr. Burnett] to Oklahoma City." This testimony elicited an objection and a motion for a mistrial from Mr. Burnett's counsel. The court overruled the objection and denied the motion, but gave a limiting instruction to the jury. The court also admitted Ms. Glass' statements regarding her relationship to Mr. Burnett and Ruthy Maye Simmons.

The only physical evidence against Mr. Burnett was a single fingerprint found on the adhesive side of a piece of tape wrapped around one of the twelve bundles of cocaine. At both opening and closing arguments, the prosecution stressed the familial relationship between Mr. Burnett and Ms. Glass and the apparent inconsistencies in their post-arrest statements. The jury convicted Ms. Glass of possession with intent to distribute and convicted Mr. Burnett of aiding and abetting. The court sentenced Ms. Glass to 188 months and Mr. Burnett to 292 months in prison. This appeal ensued.

## II. LARRY BURNETT

### A. Ms. Glass' Statements

Mr. Burnett challenges the introduction at trial of four of his codefendant's post-arrest statements introduced into evidence through the testimony of an arresting officer.

Three of them implicate the rule announced in *Bruton v. United States*, 391 U.S. 123 (1968). One of them raises a hearsay problem.

### 1. The first statement -- *Bruton*.

Early in the trial, the first witness, Detective Leach, volunteered, in the presence of the jury: "As I was saying, yes, it did come to light by Ms. Glass that she knew Larry Burnett -- a/k/a Chris Simms, Chris Simmons, Larry Miller -- **that she had knowingly transported the narcotics along with him to Oklahoma City**." (emphasis added). Mr. Burnett's counsel immediately objected and requested a mistrial, arguing the officer's testimony implicated his client in violation of *Bruton*. The court denied the request and instead instructed the jury to consider the statement attributed to Ms. Glass only against Ms. Glass and not against Mr. Burnett, her codefendant. At the close of the government's case, and again after conviction, the defendant sought relief for the *Bruton* violation. The district court denied both motions, concluding "any statement of defendant Glass was minor compared to the overwhelming evidence presented against defendant Burnett." Mr. Burnett challenges this conclusion on appeal.

The Sixth Amendment secures to a criminal defendant the right to confront the witnesses presented against him. The Confrontation Clause ensures a defendant charged with a crime will have an opportunity to cross-examine the witnesses against him. *Pointer v. Texas*, 380 U.S. 400, 406-07 (1965). A unique Confrontation Clause problem arises during a joint trial when one defendant's post-arrest statement inculpates a

codefendant. If the declarant exercises her Fifth Amendment right not to testify, the implicated codefendant is unable to exercise his Sixth Amendment right to cross-examine and confront her inculpatory statements. In *Delli Paoli v. United States*, 352 U.S. 232, 239-42 (1957), the Supreme Court concluded a limiting jury instruction not to use such statements as evidence against the codefendant cured any potential Sixth Amendment violation. However, eleven years later, in *Bruton*, the Court repudiated *Delli Paoli* and overruled its conclusion: "A basic premise of the Confrontation Clause, it seems to me, is that certain kinds of hearsay . . . are at once so damaging, so suspect, and yet so difficult to discount, that jurors cannot be trusted to give such evidence the minimal weight it logically deserves, whatever instructions the trial judge might give." *Bruton*, 391 U.S. at 138 (Stewart, J. concurring) (citations omitted). The Court concluded the admission of a nontestifying defendant's statement implicating a codefendant violates the Sixth Amendment even with the protection of a limiting instruction. *Id.* at 126.

Here, it is undisputed a *Bruton* violation occurred. Ms. Glass' statement, as recounted by the testifying officer, directly inculpated Mr. Burnett. Ms. Glass never took the stand to testify; therefore, Mr. Burnett never had the opportunity to cross-examine the declarant of that statement. The court's limiting instruction could not cure the Sixth Amendment transgression. However, "[t]he mere finding of a violation of the *Bruton* rule in the course of the trial . . . does not automatically require reversal of the ensuing criminal conviction." *Schneble v. Florida*, 405 U.S. 427, 430 (1972). Instead, we must

- 8 -

inquire whether the error was harmless. ***Chapman v. California***, 386 U.S. 18, 22 (1967) ("We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.").

To hold an error of constitutional dimension harmless, we must conclude "the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." ***Schneble***, 405 U.S. at 430. We review the record de novo, ***United States v. Perdue***, 8 F.3d 1455, 1469 (10th Cir. 1993), and our judgment is informed by the context in which the statement was admitted, how it was used at trial, and how it compares to the properly admitted evidence. *See, e.g.,* ***Bond v. Oklahoma***, 546 F.2d 1369, 1376 (10th Cir. 1976) ("[U]se of the confession in argument is also to be considered in judging the effect of the confession and whether its admission could be held harmless error."); ***United States v. Detrich***, 865 F.2d 17, 22 (2d Cir. 1988) ("When the government's proof relies primarily on circumstantial evidence, trial errors tend to acquire greater significance. It takes less to tip the scales.").

The jury was instructed to find Mr. Burnett guilty of the charge of aiding and abetting only if the government had shown beyond a reasonable doubt Mr. Burnett: (1)

knew the crime charged was to be committed or was being committed; (2) knowingly did some act for the purpose of aiding and abetting the commission of that crime; and (3) acted with the intention of causing the crime to be committed. The jury was further instructed:

> Merely being present at the scene of the crime or merely knowing that a crime is being committed or is about to be committed is not sufficient conduct for the jury to find that the defendant aided and abetted the commission of that crime. The government must prove that Defendant Burnett knowingly associated himself with the crime in some way as a participant -- someone who wanted the crime to be committed -- not as a mere spectator.

Exclusive of the ***Bruton*** statement, the totality of the government's remaining evidence against Mr. Burnett, assuming its proper admission, was: (1) he flew on the same flight as Ms. Glass, his half-sister; (2) when he disembarked from the plane he repeatedly looked over his shoulder at the other departing passengers; (3) he continued looking around until he reached the baggage claim area; (4) Mr. Burnett's luggage contained men's clothing, but did not include any underwear or socks; (5) Ms. Glass' luggage contained men's underwear and socks; (6) Mr. Burnett apparently lied when he said he was visiting his grandmother; (7) when Ms. Glass was taken into custody, Mr. Burnett called her a nickname and said everything would be all right; and, finally, (8) Mr. Burnett's fingerprint was found on the inside of a piece of tape used to wrap the cocaine.

Facts (1) - (7), at best, constitute evidence Mr. Burnett and Ms. Glass were traveling together. However, as the jury was instructed, mere presence at the scene of a

crime or merely knowing a crime was being committed is not sufficient conduct to find Mr. Burnett aided and abetted Ms. Glass.

The only other incriminating evidence is the fingerprint. However, when viewed in context, the significance of this evidence is ambiguous. Ms. Glass was carrying twelve bundles of crack cocaine. The officers discovered the cocaine tucked inside athletic socks, enveloped in freezer bags, and wrapped with multiple strips of "box tape." Mr. Burnett's fingerprint was found near the serrated edge on the adhesive side of a single piece of tape. While one fingerprint on the end of a piece of tape could indicate Mr. Burnett taped the package closed, the location could also be indicative of innocent activities, particularly in light of the absence of Mr. Burnett's prints on any other surface. We believe, in this circumstance, a single fingerprint does not constitute "overwhelming" evidence supporting a conviction for aiding and abetting.

The statement attributed to Ms. Glass, "**that she had knowingly transported the narcotics along with [Mr. Burnett] to Oklahoma City,**" informed the jury of the ultimate conclusion they needed to reach to convict Mr. Burnett. Given the statement was presented to the jury through the first witness and the circumstantial evidence in this case is not overwhelming, we cannot say beyond a reasonable doubt such a damaging utterance had "no probable impact on the minds of the jury" and was therefore harmless error. *United States v. Hill*, 901 F.2d 880, 885 (10th Cir. 1990).

## 2. The remaining *Bruton* statements.

In their initial interviews with the officers, both Mr. Burnett and Ms. Glass denied knowing one another. Apparently, the government's purpose in introducing these statements was to demonstrate through other evidence the denials were false and supported an inference of consciousness of guilt. *See, e.g., United States v. Ingram*, 600 F.2d 260, 262 (10th Cir. 1979).

In Mr. Burnett's case, demonstrating his acquaintance with Ms. Glass would have a two-fold impact. First, it would prove he made false exculpatory statements. Second, it would constitute strong circumstantial evidence the defendants worked together, thus supporting the charge Mr. Burnett aided and abetted Ms. Glass. In fact, tying the two together was critical and necessary to the government's case.

Over objection, the government, through a detective's testimony, introduced Ms. Glass' statements. She first told interviewers she and Mr. Burnett were "half-brother and half-sister." Later, she named Ruthy Maye Simmons, the woman Mr. Burnett claimed was his grandmother, as her grandmother. Both of these statements established the relationship between the codefendants critical to support the aiding and abetting charge against Mr. Burnett. Yet, both statements are attributable only to Ms. Glass, a nontestifying codefendant. Therefore, *Bruton* is once again implicated, and we examine the admission of the statements for harmless error. *Schneble*, 405 U.S. at 430.

The prosecution contends **Bruton** is inapplicable because the statements are not facially inculpatory. The government maintains a mere statement of relationship would never raise a **Bruton** issue, relying heavily upon **United States v. Arias**, 984 F.2d 1139, 1143 (11th Cir. 1993). In that case, husband and wife codefendants each challenged the admission of the other's post-arrest statements because they made reference to their marital status. The court determined **Bruton** was not implicated, broadly stating "[f]or **Bruton** to apply, a codefendant's statement must be clearly inculpatory standing alone." **Id.** at 1142 (quotations omitted).

However, **Arias** is distinguishable. In **Arias**, the marital relationship was never at issue. In fact, each defendant's *own* statement established the relationship. The court expounded upon the vast amount of other evidence presented that already established the relationship, in essence performing a harmless error analysis to bolster its conclusion.

In this case, the familial relationship was a critical element of the government's proof, and Ms. Glass' statements were the only direct testimonial evidence affirmatively linking the two defendants. Indeed, the government's use of the relationship throughout its closing arguments underscores the importance of the statements.

The prosecutor argued: "when the man known at that time as Larry Miller was questioned and he gave a statement, he also stated -- you have this introduced into evidence -- he had never spoken with the girl before he arrived in Oklahoma City. Again, obviously a false statement since it is his sister. . . . why the false statements unless the

- 13 -

two of them are involved in it together?" In fact, the government, in its fifteen minute closing, used the term "brother" or "sister" over ten times.

Because the relationship of the defendants was so obviously important to the prosecution, we cannot say its introduction in violation of ***Bruton*** was harmless beyond a reasonable doubt. To the extent the court's decision in ***Arias*** can be read to require a different result, we must disagree.

### 3. The hearsay statement.

Finally, Mr. Burnett claims admission of testimony establishing Ruthy Maye Simmons was deceased was also reversible error. The officer testified Ms. Glass informed him Ruthy Maye Simmons was dead. Because the statement was introduced to establish the truth of that assertion, as applied to Mr. Burnett, the evidence is classic hearsay. Fed. R. Evid. 801(c). Moreover, the only relevance of the testimony is to controvert Mr. Burnett's assertion he was going to visit Ruthy Maye Simmons. The statement was inadmissable hearsay against Mr. Burnett and irrelevant to the government's case against Ms. Glass. However, because we conclude the judgment against Mr. Burnett must be reversed, we merely note the error here without determining whether it is reversible.

- 14 -

### B. The Alleged Fourth Amendment Violation

In a pre-trial motion, Mr. Burnett argued he was illegally seized and moved to suppress any physical evidence, oral statements, or fruits arising from the seizure. The district court denied Mr. Burnett's motion in a written order following an evidentiary hearing. Mr. Burnett challenges that denial.

On appeal from the denial of a motion to suppress, we view the evidence in the light most favorable to the government and accept any factual findings of the district court unless they are clearly erroneous. *United States v. Scroger*, 98 F.3d 1256, 1259 (10th Cir. 1996). Although the district court did not make extensive factual findings,[1] it did find Detective Mark Wenthold to be a credible witness. Accordingly, we draw our facts surrounding Mr. Burnett's arrest from Wenthold's testimony. *See United States v. Griffin*, 7 F.3d 1512, 1516 (10th Cir. 1993) ("We therefore decide this case on the assumption the testimony of the police officers was true and we give to this testimony the benefit of every reasonable inference."). We review de novo the district court's

---

[1]In its written order, the district court found: (1) the encounter between Detective Wenthold, Detective Rivers, and Larry Burnett was "purely consensual"; (2) Detective Rivers told Mr. Burnett he was not under arrest and was free to leave; (3) Mr. Burnett agreed to talk to the officers and gave his consent to be pat-searched; (4) during the search, Detective Rivers felt what he believed to be a soft baggy and asked Mr. Burnett if he had drugs on his person; (5) Mr. Burnett replied that he did; (6) marijuana was found, and Mr. Burnett was arrested.

The court denied Mr. Burnett's motion to suppress on the basis of these findings.

conclusion of law whether a seizure occurred. *United States v. Ward*, 961 F.2d 1526, 1534 (10th Cir. 1992).

What began as a consensual encounter, Mr. Burnett contends, escalated into a seizure when Rivers asked to pat-search Mr. Burnett for drugs, after identifying himself as a drug interdiction officer looking for narcotics. Mr. Burnett argues any reasonable person who was the object of such a focused inquiry would not feel free to leave. Under this theory, Mr. Burnett was therefore the subject of a *Terry* stop, an investigative detention for which the officers were required to have reasonable suspicion. *See United States v. Sokolow,* 490 U.S. 1, 7 (1989) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot . . . .'") (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). In addition, Mr. Burnett contends because no reasonable suspicion existed for this detention, the stop was illegal and tainted any consent he might have given for the subsequent search. *United States v. Blanco*, 844 F.2d 344, 350 (6th Cir. 1988); *United States v. Grant*, 920 F.2d 376, 388 (6th Cir. 1990). Because we conclude the encounter between Mr. Burnett, Detective Rivers, and Detective Wenthold remained consensual until his arrest, we need not reach these latter arguments.

"So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual

nature." ***Florida v. Bostick***, 501 U.S. 429, 434 (1991) (citation omitted). We analyze whether a reasonable subject would feel free to leave under a totality of the circumstances test. ***United States v. Lambert***, 46 F.3d 1064, 1067-68 (10th Cir. 1995) ("Whether a police-citizen encounter constitutes a seizure turns on a consideration of 'all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" (quoting ***Bostick***, 501 U.S. at 439)).

In determining whether a defendant was seized, we have considered it significant the encounter occurred in a confined or nonpublic space, ***United States v. Griffin***, 7 F.3d 1512, 1518-19 (10th Cir. 1993); ***United States v. Bloom***, 975 F.2d 1447, 1453-54 (10th Cir. 1992); ***Ward***, 961 F.2d at 1531; the officers confronting the subject were armed or uniformed, ***Bloom***, 975 F.2d at 1454; more than one officer confronted the subject, ***Bloom***, 975 F.2d at 1454; ***Ward***, 961 F.2d at 1533; the officers exhibited an intimidating or coercive demeanor, ***Griffin***, 7 F.3d at 1519; ***Ward***, 961 F.2d at 1533; and the officers asked the subject potentially incriminating questions, ***Griffin***, 7 F.3d at 1519; ***Ward***, 961 F.2d at 1534; ***Bloom***, 975 F.2d at 1454. However, this court has steadfastly refused to view any one of these factors as dispositive. *See, e.g., **Griffin***, 7 F.3d at 1518 ("In the past, we have avoided hardline rules to govern [seizure] analysis, and our opinion today should not be interpreted as an exhaustive announcement"; *see also **United States v.***

- 17 -

*Little*, 18 F.3d 1499, 1503 (10th Cir. 1994) (en banc) (noting "only in rare instances will any one factor produce an inexorable conclusion that a seizure has occurred" and overruling any implication from previous cases that police-citizen encounters occurring in train compartments are necessarily seizures).

Here, the officers did not confront Mr. Burnett in a confined space. The encounter occurred on a public sidewalk by a passenger loading zone. The officers were not uniformed and did not display their weapons. There is no evidence the officers' conduct was menacing or coercive, and they promptly returned Mr. Burnett's ticket and identification after examining them. In short, none of the usual factors indicating a person has been seized exist in this case, except for the officers' conduct indicating Mr. Burnett was the subject of a focused inquiry. To hold a seizure occurred in this case, therefore, we must be willing to adopt a per se rule that a seizure occurs when a person has become the specific target of a police officer's inquiry and is asked to consent to a search, even though the surrounding circumstances do not indicate an atmosphere of coercion.

Mr. Burnett cites a number of cases to support his claim a police officer's particularized interest in an individual may so change the nature of a consensual encounter that a reasonable person would not feel free to leave when asked to consent to a search. *See **United States v. Bloom***, 975 F.2d 1447 (10th Cir. 1992); ***United States v. White***, 890 F.2d 1413 (8th Cir. 1989); ***United States v. Jaramillo***, 891 F.2d 620 (7th Cir.

1989); *United States v. Nunley*, 873 F.2d 182 (8th Cir. 1989); *United States v. Gonzales*, 842 F.2d 748 (5th Cir. 1988), *overruled on other grounds by United States v. Hurtado*, 905 F.2d 74 (5th Cir. 1990) (en banc); *United States v. Berry*, 670 F.2d 583 (5th Cir. 1982) (en banc). Many of these cases, particularly those of the Eighth and Fifth Circuits, give great weight in their seizure analysis to a police officer's asking directly incriminating and focused questions, almost to the point of adopting the per se rule urged upon us here. *See, e.g.*, *Berry*, 670 F.2d at 597 (discussing factors to be considered in seizure analysis and stating "[s]tatements which intimate that an investigation has focused on a specific individual easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention"); *White*, 890 F.2d at 1416 (when an officer told subject he had been stopped because he exhibited characteristics displayed by drug couriers, a seizure had occurred because the subject could reasonably believe he "'was the particular focus of a narcotics investigation,' and was not free to go" (quoting *Nunley*, 873 F.2d at 184-85)). To the extent these Eighth and Fifth Circuit cases present a per se rule that a person is seized when a police officer's conduct suggests a person is the particular focus of an investigation and the officer asks the subject to consent to a search, we decline to follow them. Although particularized focus is certainly a factor to be considered, the per se rule urged on us here would be inconsistent with our precedent.

*United States v. Bloom*, 975 F.2d 1447 (10th Cir. 1992), cited by Mr. Burnett, belies the occurrence of a seizure in this case. In *Bloom*, the defendant was confronted in

a private train compartment by two special DEA agents, one of whom was uniformed and visibly armed. The agents identified themselves, told Mr. Bloom they had experienced problems with people transporting drugs on the train, and asked if he was carrying drugs. When Mr. Bloom denied having any, the agents asked if he would voluntarily consent to a search of his luggage to verify that claim. We held the consensual encounter became a seizure when the agents asked Mr. Bloom to consent to a search of his luggage. *Id.* at 1455. Our holding, however, was expressly driven by the totality of the circumstances: The focused and incriminating questions and search consent request rose to the level of a seizure because Mr. Bloom's egress was blocked by two officers, one of whom was armed and uniformed, and the entire encounter took place in a confined, non-public space. *Id.* Even with the presence of these factors, however, *Bloom* was a close case. *See id.* at 1451; *see also Little*, 18 F.3d at 1503 (overruling *Bloom* to the extent it implied location of an encounter alone could produce a seizure). In contrast, we see no ground to find a seizure occurred here, where the encounter was in an unconfined, public place and where the officers involved were neither uniformed nor visibly armed.

*United States v. Carhee*, 27 F.3d 1493 (10th Cir. 1994), is also instructive. In *Carhee*, two officers acting on a tip approached Mr. Carhee, identified themselves, and asked if they could talk to him. Mr. Carhee agreed. When the officers asked for identification, Mr. Carhee stated he did not have any. The officers asked where Mr. Carhee had come from and he answered, Memphis, although the ticket he produced was

written in the name of Raymond Jones and identified his point of origin as Los Angeles. The officers asked Mr. Carhee if he was carrying narcotics into Oklahoma City. He said he was not. They requested permission to search his luggage. He agreed. They found nothing in the bag. The officers asked if there was anything in Carhee's briefcase. He said, no. Upon request, Mr. Carhee consented to a search of the briefcase, but it was locked. Mr. Carhee said the briefcase belonged to someone else and he did not know the combination. The officers told Mr. Carhee they would detain the bag for a dog sniff. We held a seizure occurred when the briefcase was detained--not when the officers asked Mr. Carhee for permission to search his bag. *Id.* at 1497. We are not persuaded the events in the instant case implicate the Fourth Amendment any more than those that occurred prior to the seizure of the briefcase in *Carhee*.

### C. The Government's Use of Aliases

During trial, the prosecution elicited repeated references to Mr. Burnett's aliases through testimony of an arresting officer, testimony of a fingerprint technician, and introduction of a fingerprint card. Mr. Burnett urges the prejudicial effect of the admission of these various aliases also warrants reversal of his conviction. Because trial counsel failed to object to the admission of the aliases, we review for plain error. *United States v. Micheltree*, 940 F.2d 1329, 1333-34 (1991).[2]

---

[2]Defendant maintains trial counsel did object to the introduction of the fingerprint card with the name Chris Simmons. However, the record reflects trial counsel merely objected to admission of the card as "evidence of another crime." To placate this fear, the

(continued...)

A defendant's use of an alias to conceal his identity from law enforcement officers is relevant as proof of consciousness of guilt. *United States v. Hooks*, 780 F.2d 1526, 1532 (10th Cir. 1986). However, Fed. R. Evid. 403 counsels, even if relevant, the probative value of the evidence may be outweighed by its prejudicial effect. Neither at trial nor on appeal did Mr. Burnett challenge the introduction of his indictment which specifically listed his aliases. Because this information was already before the jury in the indictment, introduction of the aliases in testimony could not have been unduly prejudicial.

### D. The Court's Restriction of Time for Closing Arguments

Mr. Burnett claims the district court abused its discretion by limiting defense counsel's time for closing argument. He asserts that ten minutes did not afford counsel an opportunity to make all legally tenable arguments. Ms. Glass also asserts this claim, and our disposition is equally applicable to her.

"The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations." *Herring v. New York*, 422 U.S. 853, 862 (1975); *Cole v. Tansy*, 926 F.2d 955, 958 (10th Cir. 1991). Here, the issues conveyed to the jury were not complex, and the entire trial on a two-count indictment lasted two days. We do not believe a ten minute time limitation on closing arguments an abuse of

---

[2](...continued)
court allowed redaction of the card which apparently satisfied trial counsel, who replied "[t]hat would work." Counsel made no further objections.

discretion in this situation.  *See, e.g.*, **United States v. Sotelo**, 97 F.3d 782, 793 (5th Cir. 1996) (limiting closing argument to ten minutes for each defendant in case covering a six-year period and involving multiple conspiracies, 40 witnesses, 133 exhibits, a twelve-count indictment, and 22 pages of jury instructions was not abuse of discretion).

### E.  Cumulative Error

Finally, Mr. Burnett argues the cumulative effect of the errors asserted above requires reversal.  Because we have determined the **Bruton** errors standing alone require reversal, we need not address this argument.

## III.  KATRICE GLASS

### A.  Evidentiary Hearing on the Motion to Suppress

Ms. Glass filed a motion to suppress physical evidence and testimony arising from her seizure at Will Rogers World Airport.  In the brief supporting her motion to suppress, Ms. Glass noted "[t]he facts of this matter are quite simple," and adopted a portion of Detective Leach's grand jury testimony.  While Ms. Glass argued extensively her "seizure" was not supported by reasonable suspicion, she set forth no facts and made no argument in support of the contention a seizure had occurred.  The district court denied her motion to suppress without an evidentiary hearing. She now appeals that denial.

We review a trial court's denial of an evidentiary hearing on a motion to suppress for abuse of discretion. *United States v. Chavez-Marquez*, 66 F.3d 259, 261 (10th Cir. 1995). The defendant bears the burden of showing there are material facts in dispute, and an evidentiary hearing is only required when the motion to suppress "raise[s] factual allegations that are 'sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in issue.'" *Id.* (quoting *United States v. Walczak*, 995 F.2d 852, 856 (9th Cir. 1986)).

Our review of the record reveals no abuse of discretion. Ms. Glass' motion to suppress contains no factual allegations going to the issue of whether she was seized illegally, let alone factual allegations that are "definite, specific, detailed, [or] nonconjectural." Rather, by adopting Detective Leach's factual testimony as her own, she implied there was no dispute over the facts and the only issue was their legal significance. It was within the district court's discretion to find Ms. Glass had failed to meet her burden of showing facts justifying an evidentiary hearing and that the facts as stipulated did not justify suppression.

## B. The Coercion Jury Instruction

As a principal element of her defense, Ms. Glass maintained she transported the narcotics under duress and coercion. Factual support, she argues, is in the testimony of one of the arresting officers.

Q:     What did she say when you interviewed her?

A:      She said that she was in possession of this bag because she feared for the safety of her child, as well as her safety. She told me that she was in her apartment in Los Angeles when an individual came to her door . . . . After entering the apartment, he stated that he had a job for her to do. She had observed a gun during this conversation. She stated that she asked him to leave and he refused. He said that he told her she was going to do this job or her child would be killed, as well as herself.

Ms. Glass urges the trial court improperly instructed the jury on her coercion and duress defense. We need not reach the merits of Ms. Glass' argument because we conclude she was not entitled to the instruction in the first instance.

To be entitled to a coercion instruction, the defendant must make a threshold showing of (1) immediate threat of death or bodily injury; (2) a well-grounded fear the threat will be carried out; and (3) no reasonable opportunity to escape the threatened harm. *United States v. Scott*, 901 F.2d 871, 873 (10th Cir. 1990). According to Ms. Glass' own statement, the man who allegedly threatened her life and the life of her child left her apartment immediately after making the threat. He did not return for approximately thirty minutes. Upon his return, he drove her to the airport and left. The man did not accompany Ms. Glass on the plane from Los Angeles to Dallas, or from Dallas to Oklahoma City. At no time prior to her arrest in Oklahoma City did Ms. Glass attempt to contact law enforcement authorities. Her own statements, therefore, demonstrate the absence of the necessary element that she had no opportunity to escape the threatened harm. Having failed to make the third showing required of her, Ms. Glass was not entitled to the instruction in the first instance. *Id.* ("[A] defendant who fails to

present sufficient evidence to raise a triable issue of fact concerning the absence of any reasonable opportunity to escape the threatened harm is not entitled to an instruction on the defense of coercion.").

### C. Hearsay

Ms. Glass urges the **Bruton** statements establishing her relationship with Mr. Burnett were inadmissable hearsay in her case. Admittedly, those statements only have relevance in establishing Ms. Glass made false exculpatory responses to the officers when she denied knowing Mr. Burnett. However, assuming they were inadmissable hearsay, their admission cannot constitute reversible error here when the defendant was apprehended carrying a suitcase containing approximately twelve pounds of crack cocaine.

### D. Cumulative Error

Finally, Ms. Glass argues the cumulative effect of the errors urged above mandates reversal. Cumulative error analysis aggregates all errors individually found to be harmless and analyzes whether their cumulative effect is such that collectively the errors have affected the defendant's substantial rights. *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc). Here, we have at most uncovered one harmless error, and, hence, have nothing to aggregate.

## IV.  CONCLUSION

The judgment against Mr. Burnett is **REVERSED**, and the case is **REMANDED** for further proceedings.  The judgment against Ms. Glass is **AFFIRMED**.