**UNITED STATES of America, Plaintiff,**

v.

**Danielle PAUL, Defendant.**

**No. 2:03CR261DKW.**

United States District Court, D. Utah, Central Division.

Jan. 16, 2003.

Michele M. Christiansen, Salt Lake City, UT, for plaintiff.

Julie George, Salt Lake City, UT, for defendant.

## MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

WINDER, Senior District Judge.

This matter is before the court on Defendant's Motion to Suppress. On September 15, 2003, the court conducted an evidentiary hearing on the motion. Defendant Danielle Paul ("Paul") was present with her counsel, Julie George. The government was represented by Michele M. Christiansen. Following the hearing, the court ordered a transcript as well as supplemental briefing from the parties. After thorough review and consideration of the pleadings submitted by the parties, the testimony presented at the evidentiary hearing on the motion to suppress, the court enters the following memorandum decision and order.

### BACKGROUND

The court finds the relevant facts as follows.[1] At approximately 12:30 a.m. on February 26, 2003, West Valley City police officer Sean McCarthy was driving southbound on Redwood Road, at approximately 3600 South, when he observed the vehicle in front of him change lanes improperly. Officer McCarthy testified that the vehicle was moving from the far right lane into the center lane, and that the vehicle did not signal a lane change until after it had already crossed into and entered the center lane. (Tr. at 7, 21.) Officer McCarthy testified that he understands Utah law to require a driver to signal for three seconds

---

1. Reference to the transcript of the evidentiary hearing conducted on September 15, 2003, will be cited as "Tr. at __."

before moving into a new lane.[2] (Tr. at 7, 8, 21.) The Utah Code specifically provides: "A signal of intention to turn right or left or to change lanes shall be given continuously for at least the last three seconds preceding the beginning of the turn or change." Utah Code Ann. § 41–6–69(1)(b). Based on his observation of this lane-change violation, Officer McCarthy initiated a traffic stop on the vehicle. (Tr. at 9.)

Officer McCarthy initiated the stop by activating his overhead red and blue lights, he did not activate his siren. (Tr. at 11.) Officer McCarthy parked his car behind the vehicle, on the side of the road, and then approached the vehicle and made contact with the driver. (Tr. at 24.) Officer McCarthy did not ask the defendant to exit the vehicle at that time, and he spoke with her through an open window. (Tr. at 24.) The driver, later identified as the defendant Danielle Paul, told Officer McCarthy that she did not have her driver's license with her. (Tr. at 9, 24, 67.) The defendant identified herself using her sister's name, Michelle Paul, and provided her sister Michelle's date of birth. (Tr. at 9, 24, 67.) The defendant apologized for not having her license with her and Officer McCarthy asked her to wait in her vehicle. (Tr. at 9.)

Officer McCarthy returned to his vehicle to perform a warrants check on Michelle Paul. Although Michelle Paul did not have any warrants, Officer McCarthy did discover that the driver's license of Michelle Paul had been denied. (Tr. at 9, 25, 41–42.) Officer McCarthy determined that he would give the defendant a citation only for driving on a denied license. (Tr. at 9.)

While Officer McCarthy was preparing the citation, West Valley City police officer Hyrum Stohel ("Stohel"), who had been close by on an unrelated stop, joined Officer McCarthy to offer his assistance. (Tr. at 10, 27, 42, 46.) Officer Stohel parked his police vehicle behind Officer McCarthy's and did not have any of his overhead lights running. (Tr. at 11, 46, 48.) Officer McCarthy told Officer Stohel that he was issuing the driver a citation and that he was going to ask the driver of the vehicle for consent to search the vehicle. (Tr. at 27, 47, 57–58.) Officer McCarthy asked Officer Stohel to "stick around" in case he was successful in obtaining consent to search the vehicle. (Tr. at 10, 27, 28, 47, 58.) For officer safety purposes, West Valley City officers prefer to have a back-up officer present when consent to search is requested and obtained. (Tr. at 28, 47–48.)

Officer McCarthy then returned to the defendant's vehicle and asked her to step out of the car.[3] (Tr. at 67.) Officer McCarthy explained that he was issuing a citation for driving on a denied license, and that he was going to issue a warning for the improper lane change and for not having her driver's license in her possession. (Tr. at 10.) Officer McCarthy had the defendant sign the citation and gave her a copy. (Tr. at 10, 28.) Officer McCarthy then said to the defendant: "you're out of

**2.** Officer McCarthy testified that his understanding of Utah law requires a driver to signal three seconds before and three seconds *after* a lane change. (Tr. at 7.) At the court's request, Officer McCarthy read the relevant section of the traffic code and acknowledged that the law requires a "continuous signal for at least the last three seconds preceding the beginning" of the lane change, and not after. (Tr. at 8–9.) Officer McCarthy's misunder-

standing of the law is of no consequence in this case, however, as he correctly understood the law as it relates to signaling prior to a lane change.

**3.** Before returning to defendant's vehicle for the second time, Officer McCarthy turned off all of his overhead lights with the exception of the rear flashing lights so that approaching traffic could see his patrol car. (Tr. at 11.)

here." (Tr. at 12, 28–29, 42–43, 49, 67.) The defendant turned around and began walking toward her car and Officer McCarthy asked if she would mind speaking to him for a few minutes. (Tr. at 12, 29, 43, 49.) Both Officer McCarthy and Officer Stohel testified that the defendant indicated that would be fine. (Tr. at 12, 29, 49.) Officer McCarthy asked the defendant if there was anything illegal in the vehicle. (Tr. at 29, 49, 70.) The defendant responded that she was not aware of anything. (Tr. at 12, 49, 70.) Officer McCarthy asked if he could search her vehicle and the defendant replied that "it really wasn't her car so she didn't know." (Tr. at 12, 29.)

Officer McCarthy testified that at some point during the conversation about consent to search the vehicle the defendant said, "no, you can." (Tr. at 12, 29, 43.) Officer McCarthy attempted to clarify the defendant's statement by asking, "do you mean yes or no?" (Tr. at 29, 43.) Officer McCarthy testified that the defendant responded "yes." (Tr. at 29, 31, 43.) Officer McCarthy then told the defendant that if she meant yes it was okay for him to search the car, she should go stand by Officer Stohel near the front of Officer McCarthy's patrol car. (Tr. at 12, 29, 43, 50, 56.) The defendant walked over to and stood with Officer Stohel. (Tr. at 12, 13, 31, 32, 57.)

Officer Stohel was at the scene when Officer McCarthy asked for consent to search the vehicle, however, he remained near the patrol vehicles and did not accompany Officer McCarthy to engage in conversation with the defendant. Officer Stohel testified that the defendant responded verbally to Officer McCarthy's request for consent to search, but he did not hear what she said. (Tr. at 56.) Officer Stohel testified that prior to the search he heard Officer McCarthy make the comment, if it is okay to search the vehicle, walk over to the other officer. (Tr. at 56.) Officer Stohel testified that the defendant did not respond verbally to that comment, but simply walked toward him. (Tr. at 56.) Officer McCarthy did not ask the defendant to sign a written consent form. (Tr. at 29.)

At the time Officer McCarthy asked for the defendant's consent to search the vehicle it was approximately 12:45 a.m. and there were two officers present. Officer McCarthy testified that he asked in a "mellow" tone, and neither officer had a gun displayed. The officers testified that at no time during the incident did either officer make any aggressive movements toward the defendant. (Tr. at 12–13, 17, 18, 51.)

Officer McCarthy began his search by opening the driver's door. He testified that when he did so he could smell the distinct odor of burnt marijuana. (Tr. at 13.) Officer McCarthy then observed what he recognized through his experience and training to be a burnt marijuana joint sitting upon the center console near the gear shift. (Tr. at 13.) Officer McCarthy returned to the defendant, handcuffed her, and placed her under arrest for possession of marijuana. (Tr. at 13.) The defendant was immediately searched incident to arrest and a baggie containing methamphetamine was found on her person. (Tr. at 13, 38, 53.)

Officer McCarthy read the defendant her *Miranda* rights from a card that he carries with him, and defendant waived those rights and agreed to talk with Officer McCarthy. (Tr. at 13–14, 39.) The officers learned that the defendant's true name was Danielle Paul and that she had lied about her identity because she thought she had warrants from an earlier incident. (Tr. at 14.)

Upon further search of the vehicle, Officer McCarthy found more methamphet-

amine as well as a loaded firearm. (Tr. at 14–15, 33, 54.) When asked about the gun, the defendant told Officer McCarthy that she had been shot before and that she carried the firearm for protection. (Tr. at 16, 39.)

The defendant also testified at the hearing. The defendant's testimony regarding the initial stop and detention was, for the most part, consistent with the testimony of the officers. The defendant testified that she had observed Officer McCarthy behind her on Redwood Road and so she made sure to use her blinker when changing lanes. (Tr. at 65.) She further testified, however, that while certain she used her blinker, she admitted that she did not know if she had used it for a full three seconds or not. (Tr. at 68.)

The defendant testified that when asked for her license she said she did not have it with her, and she acknowledged identifying herself as Michelle Paul, her sister, and providing her sister's date of birth. (Tr. at 67.) The defendant testified that Officer McCarthy returned to his vehicle for a few minutes and then returned with a citation. (Tr. at 67.) The defendant testified that Officer McCarthy asked her to get out of the vehicle and informed her that she was driving on a denied license. (Tr. at 67.) The defendant testified that after Officer McCarthy explained the citation, she said to him: "now I know better. Now I know how to use my blinker." (Tr. at 82.) Thereafter, Officer McCarthy had her sign the citation and then, in defendant's words, "he let me go," "and I started walking back to the car." (Tr. at 67–68.) The defendant testified that she did not recall Officer McCarthy using the words "you're out of here," but she did recall him saying something like "you're free to go." (Tr. at 69.)

The defendant's testimony regarding the consent to search the vehicle, however, was in sharp contrast to that of the offi-cers. The defendant testified that she did not give Officer McCarthy consent to search. She testified that upon being asked for permission to search she replied, "no," "it is not my car," and "I don't know." (Tr. at 73.) The defendant testified that the officers told her the vehicle was going to be searched no matter what, and that Officer McCarthy said: "it is going to be searched whether you consent, we'll get the K–9 or something." (Tr. at 70.) However, the defendant testified shortly thereafter that Officer McCarthy "did not indicate that he was going to call the drug dog, but he did say that [the search] will happen like if I say yes or no, if I say no that he'll still be able to." (Tr. at 70, lines 22–24.) The defendant testified that she responded to these statements by saying, "it's not my car, I don't think it's a good idea." (Tr. at 70, 71, 73.)

The defendant testified that she never said the words "no, you can." (Tr. at 73.) Rather, the defendant testified that she said, "no, I don't think it is a good idea." (Tr. at 73.) In addition, the defendant did not recall Officer McCarthy saying if you don't mind my searching, or if it is okay if I search the vehicle, then go stand with the other officer. (Tr. at 73.) Rather, defendant claims the officer phrased it "go to the front of the car." (Tr. at 73.) The defendant testified that she then went and stood by Officer Stohel. (Tr. at 74.)

The defendant testified that the officers were "nice at first" but they started "getting mad like getting rude with me" after she told them they could not search the vehicle. (Tr. at 71.) Later in her testimony, however, the defendant said that the officers did not become "rude" until after they discovered the marijuana in the vehicle and arrested the defendant. (Tr. at 74.) The defendant testified that the officers "were starting to be rude" and "saying the 'F' word a lot" after finding the

marijuana, searching her pockets, and discovering her true identity. (Tr. at 74.)

The defendant testified that Officer McCarthy did not read her the *Miranda* rights, and that he did not ever indicate that he wanted to question or interrogate her. (Tr. at 75.)

### DISCUSSION

In her motion to suppress, the defendant asserts that the evidence seized from the vehicle and her person, as well as her statements, must be suppressed as "fruit of the poisonous tree" following an unlawful stop, detention and search. More specifically, the defendant claims (1) that the original stop of her vehicle was without cause; (2) that she was unlawfully detained by Officer McCarthy when he continued to ask questions after issuing her citation; (3) that the officers did not obtain voluntary consent to search the vehicle; and (4) that any evidence seized during the search "was tainted by the prior police illegality." Def's Mem. In Support at 7.

### I.  *The Traffic Stop*

■■■ A routine traffic stop is a seizure within the meaning of the Fourth Amendment. *United States v. Botero–Ospina,* 71 F.3d 783, 786 (10th Cir.1995), *cert. denied,* 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996). The reasonableness of such a stop is reviewed under a two-part test set forth in *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under that test, the court must make a dual inquiry asking first whether the officer's action was justified at its inception and second whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *United States v. Williams,* 271 F.3d 1262, 1266 (10th Cir.2001), *cert. denied,* 535 U.S. 1019, 122 S.Ct. 1610, 152 L.Ed.2d 624 (2002).

### A.  *The Initial Stop of Defendant's Vehicle*

■■■ A traffic stop "is reasonable under the Fourth Amendment at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that 'this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'" *United States v. Ramstad,* 308 F.3d 1139, 1144 (10th Cir.2002) (quoting *United States v. Ozbirn,* 189 F.3d 1194, 1197 (10th Cir.1999)). It is irrelevant whether the particular officer would have stopped the vehicle under the general practice of the police department or whether the officer may have had other subjective motives for stopping the vehicle. *United States v. McRae,* 81 F.3d 1528, 1533 (10th Cir.1996).

■■■ Officer McCarthy observed a violation of Utah law when he saw defendant's vehicle change lanes before signaling for the required three seconds in violation of Utah Code Ann. § 41–6–69(1)(b). Officer McCarthy testified that the defendant did not signal a lane change until she had already crossed into the center lane. (Tr. at 7, 21.) Additionally, the defendant admitted that she was not sure whether she used her signal for a full three seconds or not. (Tr. at 68.) Because Officer McCarthy had reasonable articulable suspicion that a traffic violation had occurred, the stop of defendant's vehicle was justified at its inception.

### B.  *The Detention*

Having determined that the traffic stop of defendant's vehicle was justified at its inception, the court must ask "whether the officer's actions during the detention were reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88

S.Ct. 1868. The Supreme Court has made clear that "an investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

■ "An officer conducting a routine traffic stop may run computer checks on the driver's license, the vehicle registration papers, and on whether the driver has any outstanding warrants or the vehicle has been reported stolen." *United States v. Mendez,* 118 F.3d 1426, 1429 (10th Cir. 1997). "The officer may detain the driver and his vehicle as long as reasonably necessary to make these determinations and to issue a citation or warning." *United States v. Wood,* 106 F.3d 942, 945 (10th Cir.1997); *United States v. Martinez,* 983 F.2d 968, 974 (10th Cir.1992), *cert. denied,* 507 U.S. 1056, 113 S.Ct. 1959, 123 L.Ed.2d 662 (1993). However, once the computer checks confirm that the driver has produced a valid license and proof of entitlement to operate the car, the driver must be permitted to proceed on his way, without further delay by police for additional questioning. *United States v. Anderson,* 114 F.3d 1059,1063–64 (10th Cir.1997).

■ Further questioning is permissible, however, if (1) during the course of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in criminal activity, or (2) the driver voluntarily consents to the officer's additional questioning. *United States v. Patten,* 183 F.3d 1190, 1193 (10th Cir.1999). In this case, the government has not argued that Officer McCarthy had an objectively reasonable and articulable suspicion that the defendant was engaged in criminal activity. Accordingly, the legality of Officer McCarthy's additional questioning, following the issuance of the citation, depends on whether the defendant and Officer McCarthy were engaged in a consensual encounter.

The Tenth Circuit has provided that once an officer has returned the driver's license and registration in a routine traffic stop, the officer may ask additional questions (including questions about drugs and weapons or a request for voluntary consent to search) as part of an ordinary consensual encounter so long as a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information. *United States v. McKneely,* 6 F.3d 1447, 1451 (10th Cir.1993) (quoting *United States v. Turner,* 928 F.2d 956, 958 (10th Cir.), *cert. denied,* 502 U.S. 881, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991)); *see United States v. Elliott,* 107 F.3d 810, 814 (10th Cir.1997) (providing that traffic detention ended when officer returned driver's documentation and driver's subsequent encounter with officer was consensual, even though officer did not inform defendant she was free to leave, where officer's questioning was not accompanied by a coercive show of authority); *Turner,* 928 F.2d at 959 (providing the return of a driver's documents ends the detention unless there is evidence of a "coercive show of authority"); *United States v. Werking,* 915 F.2d 1404, 1407 (10th Cir.1990) (providing that investigative detention ended when the officer returned defendant's license and registration papers, and that subsequent encounter was a "consensual encounter between a private citizen and law enforcement official"); *see also United States v. Hernandez,* 93 F.3d 1493, 1499 (10th Cir.1996) (providing that the test for a consensual encounter is not whether the defendant subjectively believed he was not free to leave, but rather whether a reasonable person in the defendant's position would believe he was free to leave).

The court considers whether a reasonable person would feel free to leave under a totality of the circumstances test. *United States v. Glass*, 128 F.3d 1398, 1406 (10th Cir.1997). Relevant considerations include, but are not limited to whether the encounter occurred in a confined or non-public space; the officers confronting the subject were armed or uniformed; more than one officer confronted the subject; the officers exhibited an intimidating or coercive demeanor; and the officers asked the subject potentially incriminating questions. *Id.* (citations omitted). Additional factors which may indicate a seizure rather than a consensual encounter include the "physical touching of the person of the citizen or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *see Elliott*, 107 F.3d at 814 (listing relevant considerations as including the presence of more than one officer, display of a weapon, physical touching, and use of commanding language). However, the Tenth Circuit has steadfastly refused to view any one factor as dispositive. *Glass*, 128 F.3d at 1406.

In this case, Officer McCarthy performed the permissible computer checks and promptly issued a citation. Upon issuing the citation, Officer McCarthy told the defendant "you're out of here." Both Officer Stohel and the defendant similarly testified that Officer McCarthy told the defendant she was free to leave, and the defendant acknowledged that Officer McCarthy "let [her] go." (Tr. at 67–68.) The court also finds it significant that after telling the defendant she was free to leave, Officer McCarthy did not simply begin asking questions of the defendant, but rather specifically asked the defendant if she would be willing to answer a few questions and she indicated she would. (Tr. at 12, 24, 49.)

The encounter that followed took place in a public space, and although it was approximately 12:45 a.m., it occurred on the side of well-traveled road that had at least six traffic lanes. Because Officer Stohel had arrived by this time, there were two officers at the scene. However, while present, Officer Stohel did not approach or confront the defendant and was not involved in the exchange between the defendant and Officer McCarthy. In fact, it appears that Officer Stohel did not have any contact with the defendant until after Officer McCarthy began to search the vehicle. The officers' vehicles were not parked in a manner that blocked or locked-in the defendant's vehicle. Officer Stohel parked his vehicle behind Officer McCarthy's and both police vehicles had turned off their flashing lights. Although both officers were wearing police uniforms, they did not exhibit any weapons. There is no evidence that the officers' conduct was menacing or coercive.[4] Officer McCarthy testified that the tenor of his conversations with the defendant was "mellow." The officers did not touch or physically restrain the defendant, nor did they use force at any time.

In light of these facts, the court concludes that the investigative detention concluded when Officer McCarthy issued the citation and informed the defendant that she was free to leave. At that point, the encounter between Officer McCarthy and the defendant was a consensual encounter between a private citizen and a law enforcement official. *See United States v.*

---

4. According to the defendant's testimony, the officers were still being "nice to [her]" at this time. (Tr. at 71.)

*Werking,* 915 F.2d 1404, 1408 (10th Cir. 1990).

## II. *Consent to Search the Vehicle*

During the course of the consensual encounter, Officer McCarthy asked for consent to search the defendant's vehicle. A search conducted pursuant to consent is an exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Valid consent is that which is "freely and voluntarily given." *Id.* at 222, 93 S.Ct. 2041 (quoting *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968)). Whether an individual freely and voluntarily gave consent is a question of fact and is determined from the totality of the circumstances. *United States v. Pena,* 143 F.3d 1363, 1366 (10th Cir.), *cert. denied,* 525 U.S. 903, 119 S.Ct. 236, 142 L.Ed.2d 194 (1998).

The government has the burden of proving valid consent. *Id.; United States v. Cody,* 7 F.3d 1523, 1526 (10th Cir.1993). First, "it must present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.'" *Pena,* 143 F.3d at 1366 (quoting *United States v. Angulo–Fernandez,* 53 F.3d 1177, 1180 (10th Cir. 1995)). Second, the government must show that the police did not coerce the individual into granting consent. *See id.*

With regard to the first step of this two-part test, the testimony regarding consent to search the vehicle was highly controverted. Officer McCarthy testified that the defendant verbally consented to the search, saying "no, you can" and "yes," and that she also non-verbally demonstrated consent by going to stand by Officer Stohel in response to his statement: "If it is okay if I search, go stand by Officer Stohel." Officer Stohel testified that he did not hear the defendant's verbal response, but he corroborated Officer McCarthy's testimony regarding defendant's non-verbal demonstration of consent. Officer Stohel testified that he heard Officer McCarthy say, "If it is okay for me to search your vehicle go walk over to Officer Stohel." (Tr. at 50.) Officer Stohel then observed the defendant walk toward him. (Tr. at 50.)

The testimony of the defendant sharply contrasted that of Officer McCarthy and Officer Stohel. The defendant testified that she never gave verbal consent to search the vehicle and that she was simply told to go and stand by Officer Stohel. The defendant testified that in response to Officer McCarthy's request to search she said, "no, I don't think it is a good idea." (Tr. at 73.)

This contradictory testimony requires the court to make a credibility determination. After hearing the testimony presented at the evidentiary hearing and reviewing all of the evidence presented to the court, the court accepts the officers' version of events. At the evidentiary hearing on this motion, the testimony and questioning of witnesses on the issue of consent was confusing at times. Nonetheless, careful scrutiny of the transcript reveals that the testimony of Officer McCarthy and Officer Stohel remained consistent throughout. In addition, the court finds it significant that Officer Stohel's testimony corroborated that of Officer McCarthy. The defendant's testimony, on the other hand, contained certain inconsistencies, *see infra* at 1167, and was, therefore, found to be less reliable.

Relying then on the testimony of Officer McCarthy and Officer Stohel, the court finds that the defendant consented to the search of the vehicle. According to the evidence, the defendant initially indicated that Officer McCarthy could search the vehicle by saying, "no, you can." (Tr. at

12, 29, 43.) Then, when Officer McCarthy attempted to clarify whether the statement "no, you can" meant yes or no, the defendant again indicated that he could search by responding "yes." (Tr. at 29.) In addition, the defendant non-verbally demonstrated her acquiescence to the search by walking over to and standing by Officer Stohel in response to Officer McCarthy statement "if you don't mind me searching the car, go stand by Officer Stohel." This evidence is adequate to support the government's burden on the first step of the test for voluntary consent. *See United States v. Pena,* 143 F.3d 1363, 1367 (10th Cir.1998), *cert. denied,* 525 U.S. 903, 119 S.Ct. 236, 142 L.Ed.2d 194 (1998) (finding statement "go ahead" provided specific and unequivocal consent when given in direct response to a search request); *United States v. Lopez,* 777 F.2d 543, 548 (10th Cir.1985) (finding defendants gave specific and unequivocal consent in response to search request where they told officers they had "nothing to hide" and then "stood by and watched as the officers searched the vehicle and at no time objected"); *see also United States v. Patten,* 183 F.3d 1190, 1194 (10th Cir.1999) ("A defendant's silence and acquiescence may support a finding of voluntary consent."); *United States v. Gordon,* 173 F.3d 761, 764 (10th Cir.) (finding defendant's non-verbal response to officer's request to open locked bag, by removing key from his pocket and handing it to the officer, constituted specific and unequivocal consent to search), *cert. denied,* 528 U.S. 886, 120 S.Ct. 205, 145 L.Ed.2d 172 (1999).

Turning then to the second part of the two-step test-whether the consent was free from coercion-the court finds that the government satisfied its burden of proving that the officers did not coerce the defendant into granting consent. In determining whether consent was free from coercion,

a court should consider, inter alia, physical mistreatment, use of violence, promises or inducements, deception or trickery, and the physical or mental condition and capacity of the defendant within the totality of the circumstances.

*Pena,* 143 F.3d at 1367 (quoting *United States v. McCurdy,* 40 F.3d 1111, 1119 (10th Cir.1994)).

The defendant testified that the officers tried to obtain her consent by treating her poorly and making threats. However, the court finds the defendant's testimony on this issue to be inconsistent and contradictory. For example, although the defendant claimed that the officer's stopped being "nice" when she refused consent, (tr. at 71), she later testified that they did not start to get "rude" until after they discovered the marijuana in the vehicle, (tr. at 74). Similarly, the defendant twice testified that the officers attempted to coerce her consent by threatening to call for the drug dog, (tr. at 70, line 14 & 70, lines 16–18), only to testify later that the officers did not, actually, threaten to call for the drug dog, (tr. at 70, lines 22–24).

With the exception of the defendant's testimony, which the court has determined to be unreliable, there is nothing in the record to suggest that the officers used inappropriate means to obtain the defendant's consent. Although there were two uniformed officers present, Officer Stohel appeared to have no contact with the defendant prior to the vehicle search. Additionally, although the officers were wearing police attire, there was no evidence that either officer unholstered his firearm. There is no reliable evidence in the record to indicate that the officers physically mistreated the defendant, or used force, coercion or any other such tactic. Therefore, the court concludes that the defendant voluntarily consented to the search of the

vehicle. Accordingly, the search did not constitute a Fourth Amendment violation.

Therefore, based on the foregoing and good cause appearing, IT IS HEREBY ORDERED that defendant's motion to suppress is denied.