**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 23 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

             Plaintiff-Appellee,

v.                                                              No. 97-5180

BILL HANZLICEK,

             Defendant-Appellant.

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 96-CR-115-BU)**

---

Craig Bryant, Tulsa, Oklahoma, for Defendant-Appellant Bill Hanzlicek.

Neal B. Kirkpatrick, Assistant United States Attorney, (Stephen C. Lewis, United States Attorney, with him on the brief), Tulsa, Oklahoma, for Plaintiff-Appellee.

---

Before **ANDERSON**, **KELLY**, and **MURPHY**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

# I. INTRODUCTION

Bill Hanzlicek was convicted, following a jury trial, of one count of conspiracy in violation of 18 U.S.C. § 371, two counts of mail fraud in violation of 18 U.S.C. § 1341, and one count of attempting to pass a falsely made obligation of the United States in violation of 18 U.S.C. § 472. Hanzlicek's convictions arose out of a conspiracy on the part of himself and others to avoid their debts through the use of fraudulent "checks." Hanzlicek raises the following five alleged errors in asserting that his convictions should be reversed on appeal: (1) an impermissible variance existed between the indictment, which alleged a single conspiracy, and the government's proof at trial, which supposedly established the existence of multiple conspiracies; (2) the district court erred in tendering a deliberate ignorance instruction to the jury; (3) the district court erred in allowing a government agent to give hearsay testimony regarding $1.8 million in losses supposedly sustained from similar/related fraudulent checks; (4) the government violated its duties under *Brady v. Maryland*, 373 U.S. 83 (1963), in failing to produce evidence of any losses resulting from the Schweitzer checks; and (5) the evidence was not sufficient to support his conviction for passing a counterfeit obligation in violation of § 472. This court exercises jurisdiction pursuant to 28 U.S.C. § 1291 and **affirms**.

## II. BACKGROUND

Hanzlicek and his wife, Karen Hanzlicek (hereinafter "Mrs. Hanzlicek"),[1] were charged by indictment with conspiracy, bank fraud,[2] mail fraud, and passing a counterfeit obligation of the United States. The charges arose out of the Hanzliceks' participation in two related anti-government groups: the Kansas "common law court" and the Freeman movement headquartered in Montana. As part of a scheme engaged in and supported by both groups, the Hanzlicek's mailed counterfeit checks totaling $1,240,000 to banks, bank subsidiaries, and others. The Hanzliceks acquired the fraudulent checks and learned the methodology of the scheme from LeRoy M. Schweitzer, the leader of the Montana Freemen.

Specifically, the Hanzliceks mailed or hand delivered the following fraudulent checks to creditors in an attempt to satisfy their personal debts: $1,000,000 to the recorder of Jackson County, Kansas, for a notary public bond

---

[1]The Hanzliceks were tried jointly and were both convicted on the same counts. Although Mrs. Hanzlicek also appealed her convictions, this court recently dismissed her appeal under the fugitive disentitlement doctrine. *See United States v. Hanzlicek*, No. 97-5172, slip op. at 5 (10th Cir. Aug. 16, 1999).

[2]Although the jury convicted Hanzlicek on the bank-fraud count, the district court granted Hanzlicek's motion for dismissal of the bank-fraud conviction because the government failed to prove that the FGB Reality Advisors, Inc., the victim of the scheme, was a financial institution as required under 18 U.S.C. § 1344(1).

-3-

for Hanzlicek[3]; $180,000 to FGB Realty Advisors, Inc. (a wholly owned subsidiary of First Nationwide Bank) to satisfy a $56,000 debt; $60,000 to Ag America (FCB) to satisfy a debt of $35,619. Because the checks were for amounts much greater than the debts owed, the Hanzliceks requested refunds of the remaining amounts. The superseding indictment charged that the Hanzliceks, with the help of unindicted co-conspirator Rockie Broaddus, a "de jure notary public" and "sui juris" of the common law court,[4] mailed a false and fraudulent "Common Law Affidavit of protest" to some of the victims when the checks were not honored.

Tommie Canady, a FBI special agent who investigated the criminal activities of Schweitzer and the Montana Freemen, testified for the government. His testimony included information from an FBI investigation that began monitoring Schweitzer seminars in December of 1995. At the seminars, Schweitzer discussed the use of fraudulent checks to avoid the payment of debts and to obtain large refunds of "overpayments." These "checks" contained the

---

[3]Such a bond need only be in the amount of $7500. *See* Kan. Stat. Ann. § 53-102.

[4]The common law court movement is described in the indictment as "an informal, unofficial organization, [that is] falsely and fraudulently styled a 'common law court,' located in Netawake, Kansas." Mrs. Hanzlicek was involved in setting up such a system in Kansas based on the procedures Schweitzer taught her during his seminar. Hanzlicek identified himself in signed documents as a "justice of the peace, pro tempore" of this common law court.

caption "Certified Banker's Check" and/or "Comptroller Warrant" and bore the number of a Norwest Bank account. Persons attending a Freemen seminar received these checks after attending the meeting, usually after paying Schweitzer a donation. In addition, seminar attendees were taught to file a lien against those to whom the checks were presented in the event the checks were not honored. On July 21 and November 4, 1995, Mrs. Hanzlicek attended Freemen seminars in Montana presented by Schweitzer.

The government also introduced and played taped conversations between Mrs. Hanzlicek and Schweitzer. These recordings were the result of government wiretaps. The conversations included discussion about the checks, liens, and procedures Schweitzer wanted his classes to follow, the Freemen movement, and the "common law court" movement in Kansas.

### III. ANALYSIS

*A. Variance Between Indictment and Proof at Trial*

Hanzlicek argues that an impermissible variance exists between the indictment, which alleged a single, overarching conspiracy, and the evidence adduced at trial, which demonstrated multiple independent conspiracies. To obtain a conspiracy conviction, the government must prove that: (1) there was an agreement to violate the law; (2) the defendants knew the essential objectives of

-5-

the conspiracy; (3) the defendants knowingly and voluntarily participated in the conspiracy; and (4) interdependence existed among the coconspirators. *See United States v. Ailsworth*, 138 F.3d 843, 850 (10th Cir.), *cert. denied*, 119 S. Ct. 221 (1998). These elements may be proven by direct or circumstantial evidence. *See United States v. Evans*, 970 F.2d 663, 668 (10th Cir. 1992).

"A variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment." *See United States v. Edwards*, 69 F.3d 419, 432 (10th Cir. 1995). Any such variance is reversible error only if it affects the substantial rights of the accused. *Ailsworth*, 138 F.3d at 848. "Accordingly, where a single conspiracy is charged in the indictment, and the government proves only multiple conspiracies, a defendant who suffers substantial prejudice must have his conviction reversed." *Edwards*, 69 F.3d at 432 (citing *Kotteakos v. United States*, 328 U.S. 750, 773-74 (1946)). A variance is prejudicial when guilt is imputed to one defendant from another defendant's conduct. *See Kotteakos*, 328 U.S. at 775-77.

The issue of whether a single conspiracy existed is a question of fact for the jury; this court reviews the jury's decision on the question in the light most favorable to the government. *See Edwards*, 69 F.3d at 432. The inquiry focuses on whether the necessary interdependence existed between the coconspirators. *See id.* Interdependence exists when each alleged coconspirator's activities

"constituted essential and integral steps toward the realization of a common, illicit goal." *Id.* (quotation omitted).

During the trial, evidence was admitted regarding not only the conspiracy as charged in the indictment, but additional conspiracies involving Schweitzer and others. Nevertheless, viewing the evidence in the light most favorable to the government, there was sufficient evidence to prove a single conspiracy. The admissible evidence at trial demonstrates an ongoing course of conduct between the Hanzliceks, Schweitzer, and others in order to achieve a common illicit goal–to profit from the fraudulent presentation of checks and the filing of liens. In addition, there was sufficient evidence, again viewed in the light most favorable to the government, to establish the necessary interdependence in this case. The scheme depended on the Hanzliceks following the procedures Schweitzer taught in his seminars. Schweitzer suggested that Mrs. Hanzlicek send him some of the excess money after the checks were cashed, and she considered doing so. The money returned to Schweitzer from other coconspirators could also be used to further the scheme. In addition, any apparent success of others in cashing these checks assisted the promotion of the scheme. Moreover, it should be noted that the jury could infer that Hanzlicek knowingly assisted Mrs. Hanzlicek in furthering the conspiracy regarding the worthless instruments.

*B. Deliberate Ignorance Instruction*

Hanzlicek contends the district court erred in tendering a deliberate ignorance instruction to the jury. We examine jury instructions as a whole to evaluate their adequacy, and review the propriety of tendering an individual instruction *de novo*. *See United States v. de Francisco-Lopez*, 939 F.2d 1405, 1409 (10th Cir. 1991). This court has held that the giving of a deliberate ignorance instruction is appropriate only when the prosecution presents evidence that the defendant purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution. *Id* This court recognizes that the use of a deliberate ignorance instruction "is rarely appropriate . . . because it is a rare occasion when the prosecution can present evidence that the defendant deliberately avoided knowledge." *United States v. Hilliard*, 31 F.3d 1509, 1514 (10th Cir. 1994); *see also de Francisco-Lopez*, 939 F.2d at 1409. That, however, does not require direct evidence of conscious avoidance or deprive the government of the benefits of inferences from circumstantial evidence. *See de Francisco-Lopez*, 939 F.2d at 1410. Nor does it change the appellate perspective that this court views the evidence in the light most favorable to the government. *See id.*

In light of these principles, the evidence was sufficient to support the giving of the instruction in this case. At trial, the prosecution elicited testimony

from Agent Canady and the Hanzliceks regarding the highly suspicious circumstances surrounding the Schweitzer check scheme. This circumstantial evidence is probative of Hanzlicek's deliberate ignorance. *Id.* at 1412 (noting that in some cases "the clues of association with the crime charged [are] so obvious that the clues, combined with suspicion, necessarily implicate[] the defendant"). Moreover, the government elicited testimony that Hanzlicek was, in fact, suspicious about the validity of the Schweitzer checks. *See United States v. Lee*, 54 F.3d 1534, 1538-39 (10th Cir. 1995) (In evaluating the propriety of a deliberate ignorance instruction, "'[t]he evidence must establish that the defendant had subjective knowledge of the criminal behavior. Such knowledge may not be evaluated under an objective, reasonable person test.'" (quoting *de Francisco-Lopez*, 939 F.2d at 1409)). In addition, the government adduced testimony from the Hanzliceks indicating that despite several opportunities to do so, Hanzlicek "purposely" declined to learn more about the Schweitzer checks or the common law documents utilized in an attempt to intimidate recipients into cashing the checks.[5] In light of this circumstantial and direct evidence, we

---

[5]In particular, the United States relies on the following testimony of Hanzlicek:
Q   Mr. Hanzlicek, you just testified that you didn't agree with everything that was written by the common law courts?
A   Correct.
Q   So there were some things that you read and understood?
A   No, that's the reason I didn't agree with them, because I

conclude that the prosecution adduced sufficient evidence to support the giving of the deliberate ignorance instruction.

---

couldn't understand them.

Q    How can you disagree with something you don't understand?

A    Well, I guess I was too lazy to go look it up, there were words there that I didn't understand.

. . . .

Q    You purposely avoided going into what was behind these documents?

A    Purposely I had -- I didn't care because I didn't enjoy researching all of this common law stuff that I didn't understand.

Q    So as long as you got the money for your loans, for your piano, for your land, for your telephone bill, it didn't matter what was in those documents?  Is that what you are saying?

. . . .

A    Yes.

Q    That your concern was with getting the money for the piano, the telephone bill, for the land, and it wasn't concerned with how you were doing it through these documents.

A    I wasn't the one that went to the seminars to be informed on how everything was supposed to work.

Q    You could have read the documents before you signed them, couldn't you have?

A    I could have read -- yes.

Q    But you chose not to?

A    I didn't have an interest to.

Q    So it was your choice based on your interest not to look into the documents before you signed them.  Right?

A    Yes.

Q    Even though it was free money, you didn't want to see how you were going to get the free money?

A    The man was wanting to help the farmer.

Q    Help the farmer by pianos, pay off $3,000.00 telephone bills?

. . . .

A    It was his decision to decide who he was going to help and a piano wouldn't be any different than a pickup or a cow.

-10-

Hanzlicek argues that the testimony referenced above is irrelevant because the testimony relates solely to his participation in and connection to common law courts. *See* Appellant Brief at 10 ("Mr. Hanzlicek was being tried for conspiracy and for attempting to pass falsely made United States obligations, not for his participation in or knowledge of common law court activities."). We find this argument unconvincing. First, as noted above in discussing Hanzlicek's challenge to his conspiracy conviction, the Freeman checks and common-law court documents were all part of the same conspiracy charged in Count One of the Superseding Indictment. In fact, the great bulk of the intercepted telephone conversations between Mrs. Hanzlicek and Schweitzer concerned the use of common-law court documents to collect on the Freeman checks.[6] In light of the

---

[6]The following excerpt from Hanzlicek's own trial testimony demonstrates the close connection between the common-law courts materials and the Schweitzer checks.

Q. During that particular period of time, and I'm talking about the months between July and November of 1995, what were you doing during that period of time?

A. I was working eight to five, probably helping a son.

. . . .

Q. What was you wife doing during that period of time"

A. Most of the time she was – she stayed home and typed up documents, papers, in from of the computer all of the time

Q. All of the time?

A. A big share of the day, yes.

Q. Well, did you see the kinds of documents that she was typing?

A. I might have saw the papers.

Q. Did you –

-11-

fact that the government adduced sufficient evidence to prove a unified conspiracy, it would be improper to compartmentalize the common law courts documents and conclude that Hanzlicek's actions with regard to those documents is irrelevant to the question of his deliberate ignorance. Second, Hanzlicek gives an unduly narrow reading to the above testimony in concluding that it only relates to common law courts documents. Read in context, and in a light most favorable to the government, the testimony could certainly be read to embrace both the Freeman checks as well as the common-law documents considered necessary to collect on the checks.

Even were this court to conclude that the evidence adduced at trial was not sufficient to support the giving of the deliberate ignorance instruction, the error would be harmless for those reasons stated by the Eleventh Circuit in *United States v. Stone*, 9 F.3d 934, 937-42 (11th Cir. 1993). In *Stone*, the court was faced with a situation where the jury was instructed on alternate theories of actual

---

A. I didn't read them, no. I'm not saying that there were stacks, but there were documents or papers that she was always working on.

Q. And what were those papers in connection with? Why was she doing all of this typing?

A. **To get the rest of the checks ready to go**.

. . . .

Q. Was she typing documents in connection with the common law court?

A. Correct. It was – a lot of it was involved with the common law court.

-12-

knowledge and deliberate ignorance; the deliberate ignorance instruction given

properly stated the law;[7] there was sufficient, but not overwhelming, evidence of

actual knowledge; and, finally, there was insufficient evidence to support the

giving of a deliberate ignorance instruction. *Id.* at 937. Under these

circumstances, the *Stone* court held that the giving of an unsupported deliberate

ignorance instruction was harmless error.

The *Stone* court concluded that such a result was dictated by the Supreme

Court's decisions in *Griffin v. United States*, 502 U.S. 46 (1991) and *Sochor v.*

---

[7]As Hanzlicek correctly recognizes in his brief, the deliberate ignorance instruction given in this case, properly stated the law and avoided the problems identified by this court in earlier opinions–that is, the instruction does not imply that negligence or mistake is enough to support a conviction and does not shift the burden to the defendant to prove his innocence. *See United States v. Sasser*, 974 F.2d 1544, 1552 (10th Cir. 1992); *United States v. Barbee*, 968 F.2d 1026, 1033-34 (10th Cir. 1992). The instruction given here provided as follows:

> The government may prove that a defendant acted "knowingly" by proving, beyond a reasonable doubt, that the defendant deliberately closed his or her eyes to what would otherwise have been obvious to him or her. No one can avoid responsibility for a crime by deliberately ignoring what is obvious. A finding beyond reasonable doubt of an intent of the defendant to avoid knowledge or enlightenment would permit the jury to infer knowledge. Stated another way, a defendant's knowledge of a particular fact may be inferred from a deliberate or intentional ignorance or deliberate or intentional blindness to the existence of that fact.

> It is, of course, entirely up to you as to whether you find any deliberate ignorance or deliberate closing of the eyes and the inferences to be drawn from any such evidence.

> You may not infer that a defendant had knowledge, however, from proof of a mistake, negligence, carelessness, or a belief in an inaccurate proposition.

*Florida*, 504 U.S. 527 (1992). With respect to these cases, the *Stone* court noted
as follows:

> The Supreme Court's holding in [*Griffin*] substantially informs and supports our decision in this case. In *Griffin* the defendant was charged with a single count of conspiracy to defraud the federal government. The conspiracy had the dual objects of hindering the IRS and the Drug Enforcement Agency in their official duties. At trial, the Government failed to produce any evidence whatsoever to connect Griffin to an effort to interfere with the Drug Enforcement Agency. Over Griffin's objection, the trial court instructed the jury that Griffin could be convicted of conspiracy if she had participated in either of the two objects of the conspiracy. The jury returned a general guilty verdict against Griffin and her two codefendants. The Supreme Court affirmed the conviction. The Court found no precedent to support Griffin's contention that a general verdict must be set aside where "one of the possible bases of conviction was neither unconstitutional . . . nor even illegal . . . but merely unsupported by sufficient evidence." *Griffin*, 502 U.S. at 56. The Court concluded that there is a common sense reason to distinguish between a jury instruction which misstates the law and one which presents a theory of conviction not supported by the evidence:
>
>> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law--whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence.
>
> *Id.* at 59 (emphasis in original) (citation omitted).
>
> The Supreme Court reiterated that position in *Sochor v. Florida*, 504 U.S. 527, 538 (1992). In *Sochor* the trial court had instructed a capital jury on four aggravating factors, one of which was not supported by the evidence. If the jury had relied on the

unsupported factor, its death sentence recommendation would have violated the Eighth Amendment. However, the Supreme Court refused to presume jury error and noted that jurors are "indeed likely to disregard an option simply unsupported by evidence." *Id.* According to the *Sochor* Court, the lesson of *Griffin* is that due process is not violated when "a trial court instruct[s] a jury on two different legal theories, one supported by the evidence, the other not." *Id.*

*Stone*, 9 F.3d at 938-39.

Having reviewed *Griffin* and *Sochor*, this court agrees with the Eleventh Circuit that a district court does not commit reversible error where it submits a properly-defined, although factually unsupported, legal theory to the jury along with a properly supported basis of liability. *See Griffin*, 502 U.S. 60 ("What we have said today does not mean that a district court cannot, in its discretion, give an instruction of the sort petitioner requested here, eliminating from the jury's consideration an alternative basis of liability that does not have adequate evidentiary support. Indeed, if the evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing the theory from the jury's consideration. **The refusal to do so, however, does not provide an independent basis for reversing an otherwise valid conviction**." (emphasis added)). Furthermore, the analysis set forth in *Stone* is entirely consistent with Tenth Circuit precedent. *See United States v. Scott*, 37 F.3d 1564, 1578-79 (10th Cir. 1994) (citing *Stone* for proposition that giving factually unsupported deliberate ignorance instruction is

-15-

harmless if evidence of actual knowledge is sufficient); *United States v. Pace*, 981 F.2d 1123, 1130 (10th Cir. 1993) (affirming, on the basis of *Griffin*, conviction on indictment charging that defendant distributed methamphetamine **or** amphetamine, despite "total lack of evidence" concerning amphetamine); *see also Stone*, 9 F.3d at 941 (asserting that rule announced therein is consistent with Tenth Circuit precedent). Accordingly, even assuming that the deliberate ignorance instruction given in this case was not supported by sufficient evidence, the giving of the instruction was harmless.

*C. Hearsay Testimony Regarding Losses Attributable to Schweitzer Checks*

Hanzlicek claims the district court abused its discretion in admitting hearsay evidence that banks paid out $1.8 million on Schweitzer checks similar to those used by Hanzlicek. This court upholds the district court's admission of evidence unless the admission constituted an abuse of discretion. *See United States v. Lugo*, 170 F.3d 996, 1005 (10th Cir. 1999).

During trial, the government elicited testimony from Agent Canady that banks had paid out $1.8 million on Schweitzer's fraudulent checks. Defense counsel objected to the admission of this testimony on hearsay grounds and because the government had never complied with a discovery order to produce documentation of these alleged payments. The district court, however, allowed this testimony to show "the effectiveness of the scheme." The district court also

reasoned that Mrs. Hanzlicek's counsel had "opened the door" on this issue by questioning Agent Canady about several checks written by Schweitzer in an effort to prove that the Hanzliceks thought the checks were valid because nothing adverse had happened to Schweitzer. During closing arguments, the government repeatedly referred to the $1.8 million, arguing that this evidence indicates that the checks must have looked "authentic."

Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is not admissible at trial, unless otherwise provided by the Federal Rules of Evidence or other statutory authority. See Fed. R. Evid. 802. The district court found this evidence not to be hearsay because it was admitted to show "the effectiveness of the scheme." To prove the effectiveness of the check scheme, however, evidence that $1.8 million in fraudulent checks were actually cashed was necessary.

This case provides a prime example of why the hearsay rule is a crucial and necessary evidentiary safeguard to insure a criminal defendant a fair trial. "The hearsay rule seeks to eliminate the danger that evidence will lack reliability because faults in the perception, memory, or narration of the declarant will not be exposed." 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 802.02[3], at 802-9 (2d ed. 1999). Here, the jury heard unreliable

-17-

testimony regarding $1.8 million in fraudulent checks being paid out. While the government may prove this point through the use of admissible evidence,[8] Agent Canady's hearsay testimony is simply not admissible.

Having determined that this evidence was erroneously admitted, this court must now determine whether the error was harmless. *See* Fed. R. Crim. P. 52(a). The harmless error inquiry in these circumstances focuses on whether the erroneously admitted evidence had a substantial influence on the jury's verdict or leaves this court in grave doubt about whether it did. *See United States v. Cass*, 127 F.3d 1218, 1225 (10th Cir. 1997); *see also Kotteakos v. United States*, 328 U.S. 750, 765 (1946). This court reviews the record as a whole *de novo* to evaluate whether the error is harmless, examining the context, timing and use of the erroneously admitted evidence at trial and how it compares to properly admitted evidence. *See United States v. Glass*, 128 F.3d 1398, 1403 (10th Cir. 1997).

Hanzlicek argues that the effectiveness of the scheme was critical to the government's case. The bank fraud and mail fraud charges in this case both require a showing of fraudulent intent. *See United States v. Cochran*, 109 F.3d 660, 667 (10th Cir. 1997). Neither charge, however, requires that the scheme to

---

[8] *Cf. United States v. Kelley*, 929 F.2d 582, 585 (10th Cir. 1991) (allowing, but not requiring, evidence of actual pecuniary loss).

defraud result in a monetary loss. *See United States v. Hollis*, 971 F.2d 1441, 1451 n.4 (10th Cir. 1992) (holding that success of scheme not an element of mail fraud); *United States v. Young*, 952 F.2d 1252, 1257 (10th Cir. 1991) (holding that monetary loss not required for bank fraud conviction). The jury was so instructed. Accordingly, the government was not required to prove that the alleged conspiracy resulted in monetary loss.[9]

While not unmindful of the effect that evidence of an actual loss could have upon a jury, this court is required to view the record as a whole in the context of arguments raised. Although the evidence strengthened the government's case concerning the existence of a scheme to defraud and the resemblance of the instruments to genuine obligations, we conclude that the admission of this evidence was harmless error. This court cannot overlook that Mrs. Hanzlicek introduced, over the government's objection and without objection from Hanzlicek, evidence concerning nine Schweitzer checks totaling over $35 million that had come to the attention of authorities. Furthermore, Mrs. Hanzlicek persisted in this inquiry at some length, including eliciting details about how

---

[9]The effectiveness of the scheme would tend to show that the falsely made obligation imitated or resembled a genuine obligation of the United States. This is how the government characterized the $1.8 million loss evidence at trial, while, at the same time, reminding the jury that it was not required to prove any loss at all. Nevertheless, as set out below, this court rejects the contention that the government must prove that an actual government obligation was replicated to support a conviction under 18 U.S.C. § 472. *See infra* Section III.E.

some of the checks aroused suspicion.  Mrs. Hanzlicek introduced this information to establish that she believed the checks were valid and this belief was supported by the government's inaction against Schweitzer.  Moreover, Mrs. Hanzlicek testified as to her understanding that the checks had been accepted and effective.  Although she apparently was attempting to show that she had no fraudulent intent or knowledge, the evidence directly supports the existence and effectiveness of the scheme.  Mrs. Hanzlicek's counsel repeatedly characterized the items as "bogus checks" in his questioning, which also suggests that the scheme was effective, not merely a ruse that no one would take seriously.  Under these circumstances, admission of evidence concerning the $1.8 million allegedly paid is harmless.

*D.* Brady *Violations Relating to Losses Attributable to Schweitzer Checks*

Hanzlicek also contends that he was prevented from developing effective cross-examination of Agent Canady because the government failed to furnish a summary list, as ordered by the district court, of victims who had received Mr. Schweitzer's fraudulent checks and information regarding the cashing of those checks.  The government did not turn over the list to defense counsel until after the trial.  When asked during oral argument why the list was not turned over to defense counsel as ordered, the Assistant United States Attorney ("AUSA") responded, "It would have been better practice. . . .  I don't know why [the list

-20-

was not turned over]. . . . It was a mistake and negligence on my part." After the trial, and before sentencing the defendants, the trial judge stated: "[M]any of these checks on this 1.8 million dollar list that the agent testified that there had been losses on, at least it appears that there was no loss, there was in fact no loss at all." In addition, at oral argument, the AUSA admitted that there is no evidence that the checks actually had been cashed. In upholding Hanzlicek's conviction, the district court found that the introduction of evidence of $1.8 million in losses was not material to the case.

It is certainly troubling that the government never produced the list of Schweitzer checks resulting in the claimed $1.8 million paid. Nevertheless, this court cannot conclude that the government's failure to produce the list resulted in a violation of *Brady*. Hanzlicek argues that he made a specific request for such information, and that the list of checks would have enabled him to impeach Agent Canady. To establish a *Brady* violation, Hanzlicek must demonstrate that evidence was (1) suppressed by the prosecution, (2) favorable to him, and (3) material, meaning that had the evidence been disclosed to the defense, a reasonable probability exists that the result of the trial would have been different. *See Moore v. Reynolds*, 153 F.3d 1086, 1112 (10th Cir. 1998), *cert. denied*, 119 S. Ct. 1266 (1999). Materiality is gauged on the basis of the whole record, considering the undisclosed evidence collectively. *See Kyles v. Whitley*, 514 U.S.

-21-

419, 436 (1995).  A specific request for information may lower the threshold for materiality.  *See Smith v. Secretary of N.M. Dep't of Corrections*, 50 F.3d 801, 826 (10th Cir. 1995).  Nevertheless, we agree with the district court that the evidence at issue here is not material because it does not create a reasonable probability that the outcome of the trial would have been different.  Stated another way, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."  *United States v. Agurs*, 427 U.S. 97, 109-10 (1976).  In the context of what the government was required to prove, the significance of whether banks actually cashed these checks is of far less importance than suggested by Hanzlicek.

*E.  Sufficiency of the Evidence Relating to the 18 U.S.C. § 472 Conviction*

Hanzlicek argues that the evidence adduced at trial is insufficient to support his conviction for attempting to pass a falsely made obligation of the United States in violation of 18 U.S.C. § 472.  In particular, he claims that the instruments in question were not falsely made obligations or securities of the United States as required by § 472.  In challenging his conviction on sufficiency-of-the-evidence grounds, Hanzlicek is "faced with a high hurdle: in reviewing the sufficiency of the evidence to support a jury verdict, this court must review the record de novo and ask only whether taking the evidence–both direct and

-22-

circumstantial, together with the reasonable inferences to be drawn therefrom–in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *See United States v. Voss*, 82 F.3d 1521, 1524-25 (10th Cir. 1996) (quotations omitted).

This court concludes there was sufficient evidence admitted at trial to sustain Hanzlicek's conviction under § 472. First, contrary to his contentions, the "Certified Bankers Check" in this case clearly falls within the definition of "obligation or other security of the United States" which includes "checks, or drafts for money, drawn by or upon authorized officers of the United States." 18 U.S.C. § 8. The instrument involved in the indictment was purportedly drawn on the "Treasurer united [sic] States of America" and "Redeemable at office of Postmaster." A reasonable jury could easily conclude that it attempted to imitate a United States government obligation.

Hanzlicek also claims that the evidence is insufficient because the instruments were not of such a quality to be calculated to deceive an honest and sensible person of ordinary care, as required under § 472. In so doing, he states the standard for and derives support from cases involving uttering or possessing counterfeit currency. See *United States v. Cantwell*, 806 F.2d 1463, 1470 & n.5 (10th Cir. 1986); *United States v. Grismore*, 546 F.2d 844, 849 (10th Cir. 1976); *United States v. Drumright*, 534 F.2d 1383, 1385-86 (10th Cir. 1976). Hanzlicek,

however, was convicted of "attempt[ing] to pass, utter, and publish a falsely made obligation or security of the United States, namely, a false and fraudulent 'Certified Bankers Check' 'Comptroller Warrant', number 1310, in the amount of $180,000.00." As this court discusses below, the terms "falsely made" and "counterfeit" are not synonymous in these circumstances. *See United States v. Parnell*, 581 F.2d 1374, 1381 (10th Cir. 1978).

Hanzlicek argues the government must prove that an actual government obligation was replicated to support a conviction under § 472. An attempt to pass a falsely made obligation does not, however, require similitude where the obligation is most charitably described as a hybrid instrument given its non-standard form and nomenclature. Unlike a case involving possession or uttering counterfeit currency where the instrument must bear a likeness to the original, here no original exists. The government does not issue obligations of the form devised by Schweitzer and utilized by the Hanzliceks. It is sufficient that the government prove the instrument is falsely made, one that purports to be what it is not: an obligation of the United States, apparently in the form of a check.

## IV. CONCLUSION

For those reasons set forth above, Hanzlicek's convictions are hereby **AFFIRMED**.

No. 97-5180, United States v. Bill Hanzlicek.

**KELLY**, Circuit Judge, concurring.

I concur in the court's opinion, except the portion of § III(B) that upholds use of a deliberate ignorance instruction. Even viewing the evidence in the light most favorable to the government, see United States v. de Francisco-Lopez, 939 F.2d 1405, 1409 (10th Cir. 1991), the evidence in this case fell short of proving that the defendant purposely contrived to avoid learning the truth. See United States v. Hilliard, 31 F.3d 1509, 1514 (10th Cir. 1994). Though the prosecution attempted to elicit such evidence, the responses it received did not suffice.

For a deliberate ignorance instruction to be appropriate, the evidence must show that the defendant subjectively knew that the activity was criminal, not that a "reasonable person" would have known. See de Francisco-Lopez, 939 F.3d at 1409. It is not enough that the defendant should have known about the criminal venture, recklessly disregarded the truth, or was negligent in failing to inquire. See id. at 1410-11.

In my view, none of the evidence in this case establishes a direct or circumstantial inference that Mr. Hanzlicek deliberately acted to avoid actual knowledge of the illegality of the checks he signed or the collection procedures employed. Mr. Hanzlicek testified that he discussed the checks with his wife and expressed some skepticism to her, but she reassured him, explaining that the checks helped others pay off bills and Mr. Schweitzer wanted to help farmers in

trouble. He stated that he was not interested in reading the documents his wife gave him to sign, and that he customarily signed documents he did not read or fully understand because his wife asked him to and she had not steered him wrong before. Such conduct does not rise to the level of intentionally failing to learn facts that would reveal that Mr. Schweitzer's checks or collection scheme were fraudulent. Mr. Hanzlicek could be characterized as negligent or reckless in his actions. However, this does not support a deliberate ignorance instruction. <u>See</u> <u>id.</u> In addition, Mr. Hanzlicek's testimony goes to actual knowledge of whether the checks and other documents were illegal, and this evidence cannot be used to prove deliberate ignorance of their illegality. <u>See</u> <u>id.</u> at 1410.

The government relies heavily upon the following testimony of Mr. Hanzlicek in support of the deliberate ignorance instruction:

> Q: You purposely avoided going into what was behind these documents?
> A: Purposely I had–I didn't care because I didn't enjoy researching all of this common law stuff that I didn't understand.
> Q: So long as you got the money for your loans, for your piano, for your land, for your telephone bill, it didn't matter what was in those documents? Is that what you're saying?
> . . . .
> A: Yes.

Ct. Op. at 9-10 n.5. When Mr. Hanzlicek gave these answers, he was being questioned about "everything that was written by the common law courts," not about the fraudulent checks or common law court documents specifically used to

collect on the fraudulent checks. It is a stretch to say that Mr. Hanzlicek's failure to read and understand every document produced or relied upon by the common law court movement, including the Magna Carta and the Montana Constitution, provides evidence of deliberate ignorance. Surely not every unidentified document connected to the common law court is inculpatory, even given a conspiracy. Under this circuit's precedent, the answers to the prosecutor's questions hardly show that Mr. Hanzlicek purposely contrived to avoid learning the truth about the checks or collection documents in order to have a defense in the event of prosecution.

To be sure, the prosecution tried to elicit testimony from Mr. Hanzlicek that he deliberately avoided inquiry into the illegality of the documents he signed, but Mr. Hanzlicek's response merely indicates that he did not carefully scrutinize all of the common law court documents because he was not interested in these documents and did not understand them. Disinterest and lack of understanding on a defendant's part do not become deliberate ignorance merely because the scheme would benefit him, even when the benefits may be substantial. Taken in context and in the light most favorable to the government, the testimony simply does not support deliberate ignorance with respect to the checks and the collection documents.

Assuming error in the tendering of the deliberate ignorance instruction, the next inquiry is harmless error. According to our precedent, this determination should be made by examining the strength of the evidence against Mr. Hanzlicek, the wording of the deliberate ignorance instruction, and whether the other instructions negate any adverse effects of the improper instruction. See Hilliard, 31 F.3d at 1516; United States v. Sasser, 974 F.2d 1544, 1552 (10th Cir. 1992); United States v. Barbee, 968 F.2d 1026, 1033 (10th Cir. 1992). We are also bound by the decision in United States v. Scott, 37 F.3d 1564, 1578-79 (10th Cir. 1994), which applied the rationale of United States v. Stone, 9 F.3d 934, 941 (11th Cir. 1993). The Scott panel cited that portion of Stone explaining how Tenth Circuit cases were consistent with Stone. See Scott, 37 F.3d at 1578.

Here, the deliberate ignorance instruction has a proper subjective focus, and the instructions as a whole contain language regarding knowing and intentional conduct. Looking at the strength of the evidence against Mr. Hanzlicek in the light most favorable to the government, a rational jury could convict Mr. Hanzlicek of the charged offenses. Mr. Hanzlicek endorsed the checks, and certainly would have benefitted had the scheme been successful. Regarding actual knowledge, Mr. Hanzlicek testified to his awareness of a 1993 "common law lien" (on which his signature appeared) that was an attempt to avoid a debt. See XVII R. at 521-24. Where evidence of actual knowledge is

- 4 -

lacking, it is reversible error to give a deliberate ignorance instruction. <u>See</u> <u>United States v. Ebert</u>, 1999 WL 261590, *31-33 (4th Cir. May 3, 1999) (unpublished) (applying <u>Stone</u>). That is not the case here; hence, any error in giving the deliberate ignorance was harmless. <u>See</u> <u>United States v. Adeniji</u>, 31 F.3d 58, 62-63 (2d Cir. 1994) (considering evidence of actual knowledge in applying <u>Stone</u>). Of course, even with the <u>Stone</u> harmless error analysis, the deliberate ignorance instruction should be used cautiously. <u>See</u> <u>United States v. Mari</u>, 47 F.3d 782, 786 (6th Cir. 1995) ("We do, however, admonish the district courts against giving the deliberate ignorance instruction indiscriminately.").