UNITED STATES of America,
Plaintiff–Appellee,

v.

Cedrick Ladon CARTER, Defendant–
Appellant.

No. 01–6241.

United States Court of Appeals,
Tenth Circuit.

July 19, 2002.

Before KELLY, HOLLOWAY and BRISCOE, Circuit Judges.

### ORDER AND JUDGMENT *

HOLLOWAY, Circuit Judge.

### I

On August 8, 2000, Cedrick Ladon Carter ("Carter") was charged by a criminal complaint with conspiring to distribute cocaine powder, methamphetamine, and marijuana. He was indicted on December 19, 2000 on twenty-one counts as follows:

Count 1: conspiracy to possess with the intent to distribute and to distribute in excess of five kilograms of cocaine powder, and in excess of 50 grams of crack, in violation of 21 U.S.C. § 846;

Counts 2–5, 7, 9, 11, 12, 15, 17, 19, and 21: various offenses in connection with controlled substances in violation of 21 U.S.C. § 841(a)(1);

Counts 6, 8, 19, 13, 14, 16, 18, and 20: using a telephone in facilitating the conspiracy, in violation of 21 U.S.C. § 843(b).

On February 22, 2001, he was acquitted on counts 2, 3, 4 and 5 and convicted on all others.

On June 19, 2001, the court sentenced Carter to 324 months' imprisonment on counts 1, 7, 9, 11, 12, 15, 17, 19, and 21; and 48 months' imprisonment on counts 6, 8, 10, 13, 14, 16, 18, and 20.[1] These sentences run concurrently and are to be followed by ten years' supervised release.

---

1. This and the information immediately following, concerning Carter's sentences, is taken from the judgment of June 15, 2000. I R. Doc. 57.

Carter was ordered to pay a $100 assessment on each count, for a total of $1700.

The district court denied Carter a sentence reduction for acceptance of responsibility. The court considered and overruled Carter's objection to the denial of the reduction in sentence. V R. 368–71.

At trial, Special Agent Mike Sanders ("Agent Sanders" or "Sanders") testified regarding how cocaine powder was cooked or converted into crack cocaine. He also testified as to the meaning of two terms used by crack manufacturers, "rocking it up," and "coming back." Brief of Appellant at 18–19. He testified that the quality of powder cocaine used can produce a higher yield when it is converted to crack. Carter objected at trial, citing *United States v. Becker*, 230 F.3d 1224 (10th Cir. 2000).

## II

In 1999, the FBI and the DEA identified an organization in Oklahoma City distributing cocaine, marijuana, and methamphetamine. Carol Duran ("Duran") purchased cocaine from Jose Cruz Rivera–Zuniga ("Cruz Rivera") through his wife Crystal Gayle Rivera–Zuniga ("Crystal Rivera"). Duran distributed the cocaine to a number of others, including on a number of occasions defendant Carter. Evidence was presented showing that Carter had contact with others who were involved with Duran in distributing cocaine. Because he purchased frequently and in large quantities, Carter was able to negotiate for prices. Carter communicated to Duran the amounts of cocaine he wanted, how much he was willing to pay, how often he wanted to buy, and his customers' satisfaction with the cocaine. Evidence was presented to show that Carter participated in discussions with Duran and others to set up the particulars of drug transactions in which

he participated. II R. 116–18, 120–22, 132–48, 150–55, 161–72, 259–77.

Carter concedes that on May 2, 2000, the evidence showed that he purchased approximately 8½ ounces of cocaine powder from Duran and then gave her back half an ounce. Brief of Appellant at 16 (citing II. R. 138–47). Evidence was introduced to show that this cocaine was all or part of Duran's fee for arranging the sale. II R. 120–21; III R. 265–66.

Investigators intercepted telephone calls indicating that Carter was purchasing large quantities of powder cocaine. On June 20, 2000, agents intercepted a call between Carter and Duran arranging for a transaction involving $10,900 worth of cocaine. Carter was observed arriving at Duran's residence and was followed when he left. When police attempted a traffic stop, Carter fled and shook a large bag of cocaine out of the car window while driving. The cocaine spread over the street and the pursuing police cars. Carter was apprehended while fleeing on foot. Officers were able to retrieve slightly over five ounces (145.5g) of cocaine from the street.

### A

### Sufficiency of the Evidence

Carter argues that the evidence was legally insufficient to show conspiracy (including that he used a telephone in furtherance of a conspiracy), to prove that a substance he distributed was crack, and to prove distribution of the half ounce of cocaine he admittedly gave Duran on May 2, 2000.

Sufficiency of the evidence to support a jury's verdict is a legal issue that is reviewed *de novo*. *See United States v. Lewis*, 240 F.3d 866, 870 (10th Cir.2001). On appeal, this court "ask[s] only whether taking the evidence—both direct and circumstantial, together with the reasonable

inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Hanzlicek,* 187 F.3d 1228, 1239 (10th Cir.1999) (quotation omitted).

### 1

#### *Conspiracy*

Carter cites *United States v. Evans,* 970 F.2d 663, 671 (10th Cir.1992), *cert. denied,* 507 U.S. 922, 113 S.Ct. 1288, 122 L.Ed.2d 680 (1993), for the principle that the essential showing of interdependence of conspirators requires "proof that [the conspirators] intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged." (emphasis in original). Carter's argument is based on the principle that such a conspiracy conviction requires proof that: 1) two or more people agreed to violate federal drug laws; 2) the defendant had knowledge of the essential objective of the conspiracy; 3) the defendant knowingly and voluntarily involved himself in the conspiracy; and 4) there was interdependence between co-conspirators. *United States v. Johnson,* 12 F.3d 1540, 1545 (10th Cir.1993), *cert. denied,* 516 U.S. 847, 116 S.Ct. 139, 133 L.Ed.2d 86 (1995). It is the fourth element, interdependence, that Carter primarily challenges. Brief of Appellant at 14.

■ Carter argues that the government's evidence, at best, shows a buyer-seller relationship. He cites *United States v. Starnes,* 109 F.3d 648, 650 (10th Cir. 1997), for the principle that such a relationship, without more, is insufficient to prove a conspiracy. Carter's characterization of the evidence, however, is inaccurate. The evidence reasonably shows that he was not only a buyer, but also a distributor, since he bought in large quantities frequently and since he discussed with Du-

ran what his customers wanted. II R. 148 (testimony of Duran). This same evidence also shows that Duran knew Carter was a dealer and that she was selling him cocaine pursuant to their negotiations so that he could distribute it. *Id.* This circuit has explained that the "buyer-seller" rule is intended to protect those who buy drugs for their own personal use, not drug dealers. *United States v. Ivy,* 83 F.3d 1266, 1285–86 (10th Cir.1996) ("[T]he purpose of the buyer-seller rule is to separate consumers, who do not plan to redistribute drugs for profit, from street-level, mid-level, and other distributors, who do intend to redistribute drugs for profit, thereby furthering the objective of the conspiracy.") Mere users may conspire to possess cocaine, but not to distribute it. *Id.* at 1285 (citation omitted). Carter, however, was a distributor who sold drugs for profit. Therefore, he is not protected by this rule.

■ Further, evidence was presented from which the jury could reasonably find that Carter knew of other conspirators, had personally met and dealt with or materially assisted or attempted to assist some of them, and was significantly involved in the conspiracy. Carter participated in, heard, or was told about, Duran's discussions with them regarding transactions he later participated in. According to Duran's testimony, Carter knew persons supplying cocaine to her, including Crystal and Cruz Rivera and Duran's boyfriend Israel Aguilar ("Aguilar"). Specifically, Duran testified that Carter called her to discuss his concerns about people with binoculars (apparently the investigating officers) watching the house. II R. 153–54. Carter drove Aguilar to buy half a kilogram of cocaine at Cruz Rivera's house. *Id.* at 154–55. Carter negotiated with Aguilar to purchase cocaine. III R. 166–67, 170–71. Carter dealt personally with Cruz Rivera and Aguilar in buying half a

kilogram of cocaine at Duran's house. *Id.* at 163–65. Crystal Rivera met Carter at Duran's house and personally sold cocaine to him with Duran's assistance. II R. 121–22, 135–36. Carter paid Duran a fee in cash or cocaine for arranging transactions. *Id.* at 120–21; III R. 181, 201.

Duran's testimony regarding recorded telephone calls admitted into evidence is replete with examples of Carter making agreements with Duran or others to meet at certain times and places so that he could buy cocaine at the prices he specified, subject to agreed-on conditions. Her description of the conversations also gives rise to a reasonable inference that Carter was not a casual buyer, but rather that he had developed a degree of trust with some of the people involved in the conspiracy and was familiar with their practices. *See, e.g.,* II R. 117 (Duran's testimony that she and Carter established regular arrangements for the delivery of cocaine); *id.* at 125–30 (Duran's testimony regarding her and Carter's ongoing business relationship); *id.* at 171–72 (Duran's testimony that Carter was unhesitatingly given admission to the house).

"[I]f the activities of a defendant charged with conspiracy facilitated the endeavors of other alleged coconspirators or facilitated the venture as a whole, evidence of interdependence is present." *United States v. Horn,* 946 F.2d 738, 740–41 (10th Cir.1991). Here, it is evident that Carter's agreements with Duran facilitated the distribution of cocaine from other distributors to himself. The situation here is far from the unpurposeful interactions and incidental connections discussed in *Evans:*

> It is not enough that a group of people separately intend to distribute drugs in a single area, nor even that their activities occasionally or sporadically place them in contact with each other. People in the same industry in the same locale (even competitors) can occasionally be expected to interact with each other without thereby becoming coconspirators.

970 F.2d at 670–71. Here we find ample evidence from which the jury could reasonably have found beyond a reasonable doubt that Carter and other members of the conspiracy were interdependent.

Carter points to evidence that Crystal Rivera and Duran did not understand themselves to be conspirators or partners with Carter. The evidence makes clear, however, that Duran understood that she and Carter were making agreements to distribute cocaine and that she, Carter, and Crystal and Cruz Rivera depended on each other to buy and sell cocaine. *See, e.g.,* III R. 223 (testimony of Duran). Carter cites no authority for the proposition that a conspiracy must be identified as such by the conspirators, or that all conspirators must be equal partners in the venture. Carter also points to testimony that Duran sometimes stole small amounts of cocaine from him as evidence they were not working together. Brief of Appellant at 13 (citing II R. 137, 144–45). *See also* III R. 199–200.[2] That conspirators might steal from one another is hardly implausi-

---

**2.** After testifying that she took small quantities of Carter's cocaine without telling him, Duran replied to defense counsel's cross-examination as follows:

> Q. Now, is this how you treat your partners?
> A. No.
> Q. Is this how you treat your friends?

> A. No.

III R. 200. While this portion of the record appears to support Carter's position more strongly than the cited portion, it is still unpersuasive. Duran appears to be admitting that her behavior was wrong, not asserting that she and Carter were not partners or friends.

ble and does not significantly weaken the case against Carter.

### 2

#### Distribution of Crack

■ Carter argues that the government failed to prove that the conspiracy involved crack. The testimony of several witnesses indicated that the phrase "come back" referred to the yield when powder cocaine is cooked into crack. II R. 124–25, 139 (testimony of Duran); III R. 245–46 (testimony of Agent Sanders); *Id.* at 271–72 (testimony of Crystal Rivera). Carter concedes that he said of the cocaine that "it came back." Brief of Appellant at 15. *See* III R. 217–18. Duran testified that she asked Carter how the cooking process had gone and he assured her that of the nine ounces (approximately 252g) she had just sold him, it all "came back." II R. 124–25, 139.

From this evidence, the jury could reasonably infer that at the time Duran and Carter were arranging cocaine transactions, Duran understood that Carter would be making and distributing crack from the cocaine she sold him. The jury could also reasonably infer that the success of Duran and her suppliers in continuing to sell Carter cocaine depended on Carter's success in cooking crack and selling crack and cocaine. Viewing this evidence—taken together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, we hold that a reasonable jury could have found Carter guilty beyond a reasonable doubt of conspiracy to distribute in excess of 50 grams of crack. *Hanzlicek*, 187 F.3d at 1239.

### 3

#### Distribution of One–Half Ounce of Cocaine

■ This circuit has previously explained in *United States v. Santistevan*, 39 F.3d 250 (10th Cir.1994) the meaning of "distribution" in this context. There we noted that, in the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.*, Congress defined "distribution" as "delivery" and that it in turn defined "delivery" as "the actual, constructive, or attempted transfer of a controlled substance." *Santistevan* at 255. We went on to say that motive was not an element of the offense, taking special note of "the clarity and specificity of Congress' definition of the term 'distribution,' . . . ." *Id.* at 255 and n. 7.

Here, the evidence is uncontested; the only issue is the correct construction and application of the statute. Carter concedes that the evidence showed that Duran sold him approximately 8½ ounces of cocaine on May 2, 2000, and that he gave back half an ounce to her. He disagrees, however, that this constitutes distribution. Carter appears to be relying on two points: 1) he gave the cocaine to Duran rather than selling it to one of his customers, and 2) since it was a portion of the cocaine she had given him, he was merely giving it back rather than "distributing" it.

The statute contains no requirement as to payment, the substance's source, or the identity of transferor or transferee; any transfer will suffice. *See id.* at 255 n. 7 (observing that even a citizen who found drugs in the street and turned them in to a police station might literally have violated the statute, but expressing the belief that prosecutorial discretion would adequately protect the innocent). Therefore, Carter's arguments based on the type of transfer, and the source of the cocaine, are unavailing.

The evidence indicates that Crystal Rivera delivered approximately nine ounces of cocaine to Duran and that Duran in turn gave the cocaine to Carter. II R. 116–22. As buyer, Carter gave Duran the half ounce of cocaine as noted above, as pay-

ment for her services in arranging the transaction. *Id.* at 120–21; III R. 265–66. The delivery thus falls within the Controlled Substances Act's definition of "distribution."

We conclude that on the basis of "the evidence—both direct and circumstantial, taken together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Hanzlicek,* 187 F.3d at 1239 (citation and quotation omitted). We therefore hold that the verdict in this case was sufficiently supported by the evidence.

**B**

**Admission of Agent Sanders' Testimony**

Carter argues that Agent Sanders' testimony was inadmissible under Fed.R.Evid. 702 (expert testimony). Carter objected to admission of this evidence on the basis of *Becker,* 230 F.3d 1224. Specifically, he argues that impermissible "profiling" evidence was erroneously admitted when Agent Sanders was permitted to testify regarding how crack is cooked, the meaning of the phrases "rock it up" and "come back," and the significance of the phrase "it all came back." Brief of Appellant at 19.

At trial Carter's counsel objected on the basis of Rule 702 that 1) Sanders' expertise regarding drug terminology did not permit him to "speculate as to what [a particular person] was referring to when they were talking about rocking it up;" 2) that because Duran herself assertedly did not know what was meant by "rocking it up," Sanders' testimony as to the meaning of this term would result in unwarranted speculation and "improper inference;" and 3) that Sanders' testimony was improper "profiling" evidence under *Becker,* 230

F.3d 1224, 1231. III R. 242–44. He also now argues that Fed.R.Evid. 403 forbade admission of this evidence, although he made no such objection at trial. Carter's objection was overruled and the testimony was admitted.

A review of the record demonstrates that Carter mischaracterizes both Agent Sanders' and Duran's testimony. Sanders merely testified as to the common meaning of the term "rocking it up" on the basis of his experience, and did not speculate as to what any particular person meant by this term. Contrary to Carter's assertion, Duran's testimony demonstrated that she too knew what the term "rocking it up" meant:

Q. What is rocking it up?

A. Turning it into crack cocaine.

II. R. 124.

■ Carter's *Becker* case and Rule 702 objections therefore must rest primarily on the proposition that Agent Sanders' testimony was offered for an improper purpose, namely that it constituted "profiling" evidence, which *United States v. McDonald,* 933 F.2d 1519, 1521 (10th Cir. 1991), explained has been condemned as substantive evidence of guilt. Profiling, *McDonald* says, has been defined by various courts in different terms: "an informal compilation of characteristics often displayed by those trafficking in drugs," "an abstract of characteristics found to be typical of persons transporting illegal drugs," or "the collective or distilled experience of narcotics officers concerning characteristics repeatedly seen in drug smugglers." *Id.* (internal quotation marks and citations omitted). Essentially, it is an investigative tool. *Id.* It is apparent that the testimony admitted at trial was not of this type.

■ Furthermore, Carter has not shown how admission of the evidence affected his substantial rights as is required under Fed.R.Evid. 103(a). The testimony was general explanation, and was not fo-

cused on Carter. Sanders provided factual information and it was left to the jury to determine to what extent it might apply in the situation at hand. In addition, both Duran and Crystal Rivera testified without objection regarding the meaning of "rock it up" and "come back," and Duran testified without objection that "it all came back" meant that the person who cooked the cocaine got it all back in crack form. II R. 124–25, 139 (testimony of Duran); III R. 271–72 (testimony of Crystal Rivera).

"The specific ground for reversal of an evidentiary ruling on appeal must also be the same as that raised at trial. Absent a timely and proper objection, the alleged error will be waived on appeal except when it constitutes plain error resulting in manifest injustice." *United States v. Taylor,* 800 F.2d 1012, 1017 (10th Cir.1986) (citations omitted). Because Carter did not timely object on Fed.R.Evid. 403 grounds, we review the district court's ruling for plain error under Rule 403, and find none.

Carter therefore has not met his burden to show that the district court abused its discretion in admitting Agent Sanders' testimony.

**C**

### Constitutionality Under *Apprendi*

Carter argues that 21 U.S.C. § 841(b)(1)(A) and 21 U.S.C. § 841(b)(1)(B) are facially unconstitutional under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). He acknowledges this circuit's contrary opinion in *United States v. Cernobyl,* 255 F.3d 1215 (10th Cir.2001), but relies on *United States v. Buckland,* 259 F.3d 1157 (9th Cir.2001) as persuasive authority.

This panel is bound by the precedent of our prior panels, *In re Smith,* 10 F.3d 723, 724 (10th Cir.1993), and therefore cannot agree with Carter on this point. In addi-

tion, *Buckland* has since been reversed *en banc* on this same issue. 277 F.3d 1173 (9th Cir.2002).

**D**

### Denial of Downward Departure for Acceptance of Responsibility

■ To receive the reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a), "the defendant must prove by a preponderance of the evidence that he has clearly demonstrated acceptance of responsibility for his offense." *Ivy,* 83 F.3d at 1292 (citation, alteration, and quotation marks omitted). Carter argues that he was improperly denied the acceptance of responsibility sentence reduction.

> We review for clear error the district court's refusal to grant a reduction in offense level for acceptance of responsibility. We recognize that the sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review.

*United States v. Hawley,* 93 F.3d 682, 689 (10th Cir.1996) (citations, alteration, and quotation marks omitted).

Carter says he was "compelled to proceed to trial" because he wanted to preserve appellate review of the sentencing guideline enhancements and 21 U.S.C. § 841(b)(1)(A) and (B) enhancements, on both of which he prevailed in the district court. Brief of Appellant at 23. He also asserts that he "cooperated with the government by providing substantial information before and after the trial," but cites no evidence in support of this. Brief of Appellant at 8–9. He argues the denial was improperly based on his putting the government to its burden of proof by going to trial. Brief of Appellant at 8 (citing presentence report).

The district court explained, however, that it was aware that "in rare situations a

defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial." I.R. Doc. 57 at 9 (citations, alteration, and quotation marks omitted). This is in accord with § 3E1.1, comment. (n.2). The court then went on to reach the issue of whether Carter had demonstrated acceptance of responsibility by a preponderance of the evidence and found on the basis of the evidence before it that he had not. I R. Doc. 57 at 9; IV R. 368–71.

Carter offers no evidence to support his contentions that he accepted responsibility and cooperated fully with the government. Therefore, he makes no showing that the district court's refusal to grant a downward departure is clearly erroneous.

AFFIRMED.

---

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.

